IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

        Plaintiff,                              Civil No.  03-C-401

     v.                                    Hon. William C. Griesbach

TECUMSEH PRODUCTS COMPANY

        Defendant.

---

## AMENDED CONSENT DECREE FOR THE UPPER RIVER WORK
## ON THE SHEBOYGAN RIVER

---

## TABLE OF CONTENTS

I.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
III.   PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
IV.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
V.     GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
VI.   RETENTION OF A WORK PARTY/WORK TAKEOVER . . . . . . . . . . . . . . . . . . . . . . . 17
VII.   PERFORMANCE OF THE UPPER RIVER WORK BY THE PARTICIPATING PARTIES . . . . 27
VIII.   QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS . . . . . . . . . . . . . . . . . . . . 37
IX.   ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
X.     REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
XI.   EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . 49
XII.   PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
XIII.   ASSURANCE OF ABILITY TO COMPLETE UPPER RIVER WORK . . . . . . . . . . . . . . . . 52
XIV.   NOTIFICATION OF COMPLETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
XV.   EMERGENCY RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
XVI.   REIMBURSEMENT OF RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
XVII.   INDEMNIFICATION AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
XVIII.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
XIX.   DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
XX.   STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
XXI.   COVENANTS NOT TO SUE BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
XXII.   COVENANTS BY THE PARTICIPATING PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
XXIII.   EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION . . . . . . . . . . . . . . . . . . . . . 79
XXIV.   ACCESS TO INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
XXV.   RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
XXVI.   NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
XXVII.   EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
XXVIII.   RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
XXIX.   APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
XXX.   COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
XXXI.   MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
XXXII.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . . . . . . . . . . . . . . . . . . 89
XXXIII.   SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
XXXIV.   FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

APPENDICES

      APPENDIX A:      RECORD OF DECISION, MAY 12, 2000
      APPENDIX B:      UPPER RIVER STATEMENT OF WORK
      APPENDIX C:      MAP
      APPENDIX D:      ORIGINAL CONSENT DECREE

Case 1:03-cv-00401-WCG    Filed 01/09/06    Page 2 of 98    Document 21

# I. BACKGROUND

A.   The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607.  The United States' complaint sought, inter alia:  (1) reimbursement of costs incurred by EPA and the Department of Justice for response actions at the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin ("Site"), together with accrued interest; and (2) performance of studies and response work by the Defendant at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP").

B.   In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Wisconsin (the "State") on April 11, 2001, of negotiations with potentially responsible parties regarding the remedial design and remedial actions for the Site.

C.   In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the Department of the Interior and the Department of Commerce on April 11, 2001, of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship and encouraged the trustee(s) to participate in the negotiation of a Consent Decree.

D.   Neither the Defendant that has entered into this Consent Decree ("Settling Defendant") nor the Work Party (as defined below) admits any issue of fact or law or any liability to the Plaintiff arising out of the transactions or occurrences alleged in the complaint or this Consent Decree.  Nothing in this Consent Decree nor the entry thereof shall be construed an

acknowledgment that any release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or the environment.

E.   Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on May 21, 1986.

F.   In response to a release or a substantial threat of a release of one or more hazardous substances at or from the Site, the Settling Defendant, Tecumseh Products Company ("Tecumseh" or "Settling Defendant"), commenced in May 1987, a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

G.   Tecumseh completed a Remedial Investigation ("RI") Report in May 1990, and completed a Feasibility Study ("FS") Report in April 1998.

H.   Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, in July 1999 EPA published notice of the completion of the FS and of the proposed plan for remedial action, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator based the selection of the remedial action.

I.   The decision by EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision ("ROD"), executed on May 12, 2000, on which the State had a reasonable opportunity to review and comment. The ROD includes EPA's explanation for any significant differences between the final plan and the proposed plan as well as a

-2-

responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA.

J.     On May 12, 2004, this Court approved and entered a Consent Decree that resolved Settling Defendant's alleged liability ("Original Consent Decree" attached to this Consent Decree as Appendix D). Under the terms of the Original Consent Decree, Tecumseh is required to: 1) implement EPA's selected remedy for the cleanup of the Upper River section of the Site; 2) pay at least $2.1 million toward EPA's past response costs; and 3) pay all Upper River future response costs incurred by the United States.

K.     On or about March 25, 2003, Tecumseh and Pollution Risk Services, LLC ("PRS" or "Work Party") entered into a "Liability Transfer and Assumption Agreement" under which PRS assumed specified obligations and liabilities for remediation of the Site and associated costs for which Tecumseh is responsible under the Original Consent Decree, including Tecumseh's obligation to perform the Upper River Work under this Consent Decree.

L.     The Settling Defendant has determined that PRS' performance of the Upper River Work would be enhanced by PRS' becoming a jointly and severally liable party to this Consent Decree. PRS acknowledges that the rights and privileges accorded under its agreement with Tecumseh and this Consent Decree provide adequate consideration for PRS' agreement to perform the Upper River Work hereunder. While the Work Party may receive technical direction from EPA in the Work Party's performance of the Upper River Work, it is understood by the Parties that, as between the Work Party and the United States, this Consent Decree is not and should not be construed as a contract governed by the Federal Acquisition Regulations, 48 C.F.R. § 2.100 *et seq.*

-3-

M. The purposes of this amended Consent Decree are to: (1) memorialize PRS' assumption of certain obligations of Tecumseh regarding the Site and PRS becoming a jointly and severally obligated Party to this Consent Decree with respect to those obligations; and (2) make other relevant changes to the provisions of the Original Consent Decree.

N. Based on the information presently available to EPA, EPA believes that the Upper River Work will be properly and promptly conducted by the Participating Parties, if conducted in accordance with the requirements of this Consent Decree and its appendices.

O. Solely for the purposes of Section 113(j) of CERCLA, the Remedial Action selected by the ROD and the Upper River Work to be performed by the Participating Parties shall constitute a response action taken or ordered by the President.

P. The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1651, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over the Settling Defendant. Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendant waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. For purposes of this Consent

Case 1:03-cv-00401-WCG   Filed 01/09/06   Page 6 of 98   Document 21

Decree, including without limitation, its entry and enforcement, the Work Party hereby voluntarily submits itself to the jurisdiction of this Court. In addition, and solely for the purposes of this Consent Decree and the underlying complaint, the Participating Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

### III.  PARTIES BOUND

2.     This Consent Decree applies to and is binding upon the United States and upon the Participating Parties and their successors and assigns. Any change in ownership or corporate status of a Participating Party, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter the Participating Party's responsibilities under this Consent Decree.

3.     The Participating Parties shall provide a copy of this Consent Decree to each contractor hired to perform the Upper River Work (as defined below) required by this Consent Decree and to each person representing the Settling Defendant or the Work Party with respect to the Site or the Upper River Work and shall condition all contracts entered into hereunder upon performance of the Upper River Work in conformity with the terms of this Consent Decree. Settling Defendant, the Work Party, or their contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Upper River Work required by this Consent Decree. The Participating Parties shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Upper River Work contemplated herein in accordance with this Consent Decree. With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual

-5-

relationship with the Participating Parties within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV. DEFINITIONS

4.     Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever the terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq*.

"Consent Decree" shall mean this amended Consent Decree and all appendices attached hereto (listed in Section XXIX).  In the event of conflict between this Consent Decree and any appendix, this Decree shall control (unless Appendix D, the Original Consent Decree, becomes operative pursuant to the terms of this Consent Decree).

"Day" shall mean a calendar day unless expressly stated to be a working day.  "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Default" shall mean the occurrence of either (i) two or more Events of Material Noncompliance or (ii) one Event of Material Noncompliance defined in clause (i) of the definition of "Notice of Material Noncompliance," which Event of Material Noncompliance has not been remedied to EPA's satisfaction within 45 days (or such longer period as EPA may

-6-

allow) after the date that such Event of Material Noncompliance occurs; <u>Provided</u>, in each case of Default, the occurrences described in either item (i) or (ii) above must have been identified in a Notice of Default provided by EPA to the Participating Parties in accordance with Paragraph 11.b. of this Consent Decree.

"Effective Date" shall be the effective date of this Consent Decree as provided in Section XXVII.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Event of Material Noncompliance" shall mean the occurrence of an instance of noncompliance described in a Notice of Material Noncompliance, which Notice of Material Noncompliance has either:  (i) not been timely disputed pursuant to the requirements for disputing the Notice of Material Noncompliance; or (ii) has been timely disputed pursuant to the requirements for disputing the Notice of Material Noncompliance, but which dispute has resulted in a final administrative or judicial decision upholding EPA's issuance of such Notice of Material Noncompliance.  An Event of Material Noncompliance shall be deemed to have occurred, if clause (i) of the preceding sentence applies, on the date of issuance of the relevant Notice of Material Noncompliance, or, if clause (ii) of the preceding sentence applies, on the date of the final administrative or judicial decision upholding EPA's issuance of the relevant Notice of Material Noncompliance.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest

Case 1:03-cv-00401-WCG   Filed 01/09/06   Page 9 of 98   Document 21

shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

"Matters Addressed" by this Consent Decree are the Upper River Work, Past Response Costs, and Upper River Future Response Costs.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Notice of Default" shall have the meaning assigned to such term in Paragraph 11.b. of this Consent Decree.

"Notice of Material Noncompliance" shall mean a written notice from EPA to both of the Participating Parties of the occurrence of either:  (i) an instance of noncompliance by the Work Party with a requirement of this Consent Decree for which EPA has issued a written Notice of Noncompliance pursuant to Paragraph 80 for compliance milestones described under Paragraph 76.b. of this Consent Decree; or (ii) three separate instances of noncompliance by the Work Party with any other requirement of this Consent Decree for which EPA has issued a written Notice of Noncompliance pursuant to Paragraph 80 of this Consent Decree.  EPA's issuance of a Notice of Material Noncompliance may be timely disputed by the Work Party (or by Settling Defendant if the Work Party does not undertake such a dispute) by sending EPA a written notice of dispute within 15 days of EPA's issuance of the relevant Notice of Material Noncompliance which written notice invokes the dispute resolution procedures of Section XIX (Dispute Resolution). However, if the underlying instance(s) of noncompliance that led to a Notice of Material Noncompliance was/were disputed by either of the Participating Parties in accordance with

-8-

Section XIX (Dispute Resolution) and the involved Participating Party did not prevail, Participating Parties may not dispute the Notice of Material Noncompliance regarding such instance(s) of noncompliance.

"Notice of Noncompliance" shall have the meaning assigned to such term in Paragraph 80 of this Consent Decree.

"Operation and Maintenance" or "O & M" shall mean all activities required to maintain the effectiveness of the Upper River Remedial Action as required under the Operation and Maintenance Plan approved or developed by EPA pursuant to this Consent Decree and the Upper River Statement of Work (URSOW).

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an uppercase letter.

"Participating Parties" shall mean the Settling Defendant and the Work Party.

"Parties" shall mean the United States and the Participating Parties.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through August 31, 2002, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the Upper River Remedial Action set forth in Section II of the URSOW and the ARARs set forth in Section M (pages 83-86) of the ROD. The Performance Standards may be modified pursuant to Paragraph 21, below.

"Plaintiff" shall mean the United States.

-9-

"Pollution Risk Services, LLC," or "PRS" shall mean Pollution Risk Services, LLC, a limited liability company organized under the laws of the State of Ohio.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 *et seq.* (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on May 12, 2000, by the Regional Administrator, EPA Region 5, or his delegate, and all attachments thereto. The ROD is attached as Appendix A.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

"Settling Defendant" shall mean Tecumseh Products Company.

"Site" shall mean the Sheboygan River and Harbor Superfund Site, encompassing approximately 14 river miles, located in east-central Wisconsin, Latitude 43.75, Longitude 87.7, and running through the City of Sheboygan Falls, the Village of Kohler, and the City of Sheboygan, Sheboygan County, Wisconsin and depicted generally on the map attached as Appendix C. The portion of the river included in the Site extends from the Sheboygan Falls Dam through the Outer Harbor area on the western shore of Lake Michigan. Also included in the Site are floodplain soils adjacent to the river and soil and groundwater on the former Tecumseh Products Plant adjacent to the river in Sheboygan Falls, and all areas in close proximity to the river, floodplain soils, and former Tecumseh Products Plant necessary for implementation of the remedial action set forth in the ROD.

"State" shall mean the State of Wisconsin.

"Supervising Contractor" shall mean the principal contractor retained by or on behalf of

-10-

the Work Party to supervise and direct the implementation of the Upper River Work under this Consent Decree.

"United States" shall mean the United States of America.

"Upper River" or "upper river" shall mean that portion of the Site from the Sheboygan Falls Dam in the City of Sheboygan Falls to the Waelderhaus Dam in Kohler, including floodplain soils adjacent to the river and soil and groundwater on the former Tecumseh Products Plant site located adjacent to the river in Sheboygan Falls, and all areas in close proximity to the river, floodplain soils, and plant site necessary for implementation of the Upper River Remedial Action and Operation and Maintenance.

"Upper River Future Response Costs " shall mean all costs, including, but not limited to, direct and indirect costs, that the United States pays or incurs on or after September 1, 2002, in reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying the Upper River Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Sections VIII (Quality Assurance, Sampling and Data Analysis), IX (Access and Institutional Controls) (including, but not limited to, the cost of attorney time and any other costs incurred to secure access and/or to secure or implement institutional controls including, but not limited to, the amount of just compensation), XV (Emergency Response), and Paragraph 11.c.

"Upper River Remedial Action" shall mean those activities, except for Operation and Maintenance, required to implement the Upper River Sections of the ROD as defined below, in

-11-

accordance with the Upper River SOW and the final Upper River Remedial Design and Upper River Remedial Action Work Plans and other plans approved by EPA.

"Upper River Remedial Action Work Plans" shall mean the documents developed pursuant to Paragraph 20 of this Consent Decree and approved by EPA, and any amendments thereto.

"Upper River Remedial Design" shall mean those activities to be undertaken by the Participating Parties to develop the final plans and specifications for the Upper River Remedial Action pursuant to the Upper River Remedial Design Work Plan.

"Upper River Remedial Design Work Plans" shall mean the documents developed pursuant to Paragraph 19 of this Consent Decree and approved by EPA, and any amendments thereto.

"Upper River Sections of the ROD" shall mean those portions of the ROD that address the upper river sediments, the floodplain soils, and the groundwater and additional source investigation components of the selected remedy. These sections include, but are not limited to: Section E (Site Characteristics), Page 8, dealing with upper river PCB contamination; Section H (Remediation Objectives), subsections 1 (PCB threat objective) and 2 (PCB source/transport objective); Section L (Selected Remedy) Pages 61 to 66 (dealing with upper river sediment remedy) and Page 80 (dealing with the floodplain soils, and the groundwater and additional source investigation selected remedy components).

"Upper River Statement of Work" or "URSOW" shall mean the statement of work for implementation of the Upper River Remedial Design, Upper River Remedial Action, and

-12-

Operation and Maintenance, as set forth in Appendix B to this Consent Decree and any modifications made in accordance with this Consent Decree.

"Upper River Work" shall mean all activities the Participating Parties are required to perform under this Consent Decree, except those required by Section XXV (Retention of Records).

"Waste Material" shall mean: (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under CERCLA Section 101(33), 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous material" under the Wisconsin Statutes and Wisconsin Administrative Code, Sections NR 720 and NR 722.

"WDNR" shall mean the Wisconsin Department of Natural Resources and any successor departments or agencies of the State.

"Work Party" shall mean PRS, or any temporary or permanent replacement for PRS under Section VI (Retention of a Work Party/Work Takeover).

## V. GENERAL PROVISIONS

5.    Objectives of the Parties.  The objectives of the Parties in entering into this Consent Decree are to protect public health or welfare or the environment at the Site by the design and implementation of response actions at the Site by the Participating Parties, to reimburse response costs of the Plaintiff, and to resolve the claims of Plaintiff against Settling Defendant as provided in this Consent Decree.

-13-

6.    Commitments by the Participating Parties.

a.    The Participating Parties shall finance and perform the Upper River Work in accordance with this Consent Decree, the Upper River Sections of the ROD (as further delineated in the URSOW), the URSOW, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by the Participating Parties and approved by EPA pursuant to this Consent Decree. The Participating Parties shall reimburse the United States for Upper River Future Response Costs as provided in this Consent Decree.

b.    The obligations of the Participating Parties to finance and perform the Upper River Work and to pay amounts owed to the United States under this Consent Decree are joint and several. In the event of the insolvency or other failure of either of the Participating Parties to implement the requirements of this Consent Decree, the remaining Participating Party shall complete all such requirements as provided in Section VI (Retention of a Work Party/Work Takeover).

7.    Compliance With Applicable Law. All activities undertaken by the Participating Parties pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. The Participating Parties must also comply with all applicable or relevant and appropriate requirements of federal and state environmental laws as set forth in the ROD and the URSOW. The activities conducted in compliance with this Consent Decree will be considered to be consistent with the NCP.

-14-

8.     Permits.

a.     As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, 40 C.F.R. § 300.400(e), no permit shall be required for any portion of the Upper River Work conducted entirely on-site (*i.e.,* within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Upper River Work). Where any portion of the Upper River Work that is not on-site requires a federal or state permit or approval, the Participating Parties shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.     The Participating Parties may seek relief under the provisions of Section XVIII (Force Majeure) of this Consent Decree for any delay in the performance of the Upper River Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Upper River Work.

c.     This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

9.     Notice to Successors-in-Title.

a.     With respect to any property owned or controlled by the Participating Parties that is located within the Site, within 30 days after the entry of this Consent Decree, the Participating Parties shall submit to EPA for review and approval a notice to be filed with the Recorder's Office, Sheboygan County, State of Wisconsin, which shall provide notice to all successors-in-title that the property is part of the Site, that EPA selected a remedy for the Site on May 12, 2000, and that Parties have entered into a Consent Decree requiring implementation of the remedy. Such notice shall identify the United States District Court for the Eastern District of

-15-

Wisconsin as the Court in which this Consent Decree was filed, the name and civil action number of this case, and the date that this Consent Decree was entered by the Court. The Participating Parties shall record the notice within 20 days of EPA's approval of the notice. The Participating Parties shall provide EPA with a certified copy of the recorded notice within 14 days of recording such notice.

        b.     At least 30 days prior to the conveyance of any interest in property located within the Site including, but not limited to, fee interests, leasehold interests, and mortgage interests, the Participating Parties conveying the interest shall give the grantee written notice of: (i) this Consent Decree, (ii) any instrument by which an interest in real property has been conveyed that confers a right of access to the Site (hereinafter referred to as "access easements") pursuant to Section IX (Access and Institutional Controls), and (iii) any instrument by which an interest in real property has been conveyed that confers a right to enforce restrictions on the use of such property (hereinafter referred to as "restrictive easements") pursuant to Section IX (Access and Institutional Controls). At least 30 days prior to such conveyance, the Participating Party or Parties conveying the interest shall also give written notice to EPA and the State of the proposed conveyance, including the name and address of the grantee, and the date on which notice of the Consent Decree, access easements, and/or restrictive easements was given to the grantee.

        c.     In the event of any such conveyance, the Participating Parties' obligations under this Consent Decree, including, but not limited to, their obligation to provide or secure access and institutional controls, as well as to abide by such institutional controls, pursuant to Section IX (Access and Institutional Controls) of this Consent Decree, shall continue to be met

-16-

by the Participating Parties.  In no event shall the conveyance release or otherwise affect the liability of the Participating Parties to comply with all provisions of this Consent Decree, absent the prior written consent of EPA.  If the United States approves, the grantee may perform some or all of the Upper River Work under this Consent Decree.

## VI. Retention of a Work Party/Work Takeover

10.     The Settling Defendant has retained a Work Party to perform the Upper River Work and satisfy certain other obligations of the Settling Defendant under this Consent Decree.  Notwithstanding the Settling Defendant's retention of the Work Party each of the Participating Parties is obligated jointly and severally under this Consent Decree with respect to the Upper River Work.

11.     Enforcement Discretion/Default/Work Takeover

a.      i.      Enforcement Discretion:  Where this Consent Decree assigns a requirement to the Participating Parties, the United States shall have full authority to enforce the terms and conditions of this Consent Decree against any of the Participating Parties.  In the exercise of its enforcement discretion, EPA may issue the Participating Parties Notices of Material Noncompliance and/or Notices of Noncompliance, and/or take any action in accordance with this Consent Decree to induce the Participating Parties to remedy any noncompliance described in such notices.  EPA's issuance of a Notice of Material Noncompliance shall be without prejudice to – and shall not affect, impair, prohibit, or compel – EPA's right under this Consent Decree to issue Notices of Noncompliance to and/or impose stipulated penalties against the Participating Parties under Section XX (Stipulated Penalties).  As further addressed in Paragraph 80 of this Consent Decree, stipulated penalties shall accrue against the Participating

-17-

Parties in accordance with the terms of this Consent Decree regardless of EPA's issuance or lack of issuance of a Notice of Noncompliance, Notice of Material Noncompliance, or Notice of Default.

ii.     Notwithstanding the provisions of Paragraph 11.a.i. above, EPA acknowledges that the Work Party will be the party primarily responsible for the performance of the Upper River Work on the terms and conditions set forth herein, and in its enforcement discretion, will initially seek performance, corrective measures, and stipulated penalties for noncompliance with the terms of this Consent Decree only from the Work Party, unless and until:  (1) EPA issues a Notice of Default pursuant to Paragraph 11.b. below and Settling Defendant thereafter fails to replace the Work Party in strict accordance with the requirements of this Consent Decree (including, without limitation, having any replacement Work Party become a signatory and party to this Consent Decree); or (2) any obligations imposed by this Consent Decree become unenforceable against the Work Party including, without limitation, by reason of the Work Party's bankruptcy, insolvency, winding up, or other dissolution and/or the Work Party's failing to become (or ceasing to be) a party to this Consent Decree.  If the conditions described in either (1) or (2) of the preceding sentence occur, EPA may immediately thereafter seek performance, corrective measures, and stipulated penalties for noncompliance with the terms of this Consent Decree from Settling Defendant.

iii.     In its discretion, the Settling Defendant may seek to achieve compliance through the selection and employment of a replacement Work Party, using the procedures set forth in Paragraph 12 of this Consent Decree.

-18-

b.    Default.  If EPA determines that a Default has occurred, EPA may, in its discretion, issue written notice of such Default ("Notice of Default") to the Participating Parties. Neither EPA's determination that a Default has occurred nor EPA's issuance of a Notice of Default may be disputed by any Participating Party, whether under Section XIX (Dispute Resolution) of this Consent Decree or otherwise.  A Notice of Default shall:  (1) identify the Event or Events of Material Noncompliance that are the basis of the Default (as set forth in the definition of Default); (2) require Settling Defendant to replace the Work Party; and (3) specify whether the current Work Party may continue to perform the Upper River Work while its replacement is being retained by the Settling Defendant or whether a temporary contractor must be retained by the Settling Defendant to perform the Upper River Work while a permanent replacement is being retained by the Settling Defendant.  Written proposals for both a temporary contractor and/or the Work Party's permanent replacement shall be in accordance with Paragraphs 12 and 13 below.

c.    Work Takeover.  EPA may assume the performance of all or any portion of the Upper River Work (a "Work Takeover") as EPA determines necessary, if:

i.    EPA determines that the Work Party is implementing the Upper River Work in a manner that may cause an endangerment to human health or the environment, in which case EPA shall issue a written notice (a "Work Takeover Notice") to the Participating Parties.  Any Work Takeover Notice issued by EPA will provide the grounds upon which EPA is issuing such notice and will provide Participating Parties with a period of 10 days from the date of issuance in which to remedy the circumstances giving rise to EPA's issuance of such Work Takeover Notice.  If, after expiration of the 10-day notice period, Participating Parties have not

-19-

remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant

Work Takeover Notice, EPA may at any time thereafter takeover all or any portion of the Upper

River Work as EPA determines necessary. EPA shall notify Participating Parties by telephone or

in writing (which writing may be made via e-mail) if EPA determines that a Work Takeover is

warranted under this Paragraph;

   ii. The Work Party ceases performance of the Upper River Work as a

result of insolvency and/or bankruptcy, and after EPA issues a Notice of Default notifying the

Settling Defendant of the Work Party's ceasing performance of the Upper River Work: (1)

Settling Defendant fails to name a permanent replacement Work Party in accordance with the

procedures and time periods set forth in Paragraph 12.b.; and (2) Settling Defendant fails to join

in the United States' motion for reinstatement of the Original Consent Decree (referenced in

Paragraph 12.c.); or

   iii. EPA issues a Notice of Default for any other reason provided in

this Consent Decree, and after such issuance: (1) a permanent replacement Work Party is not

named by the Settling Defendant in accordance with the procedures and time periods set forth in

Paragraph 12.b. below; and (2) Settling Defendant fails to join in the United States' motion for

the Court's reinstatement of the Original Consent Decree (referenced in Paragraph 12.c.).

   d. Unless paid or reimbursed by the proceeds of the financial assurance

mechanism established pursuant to Section XIII (Assurance of Ability to Complete Work), costs

incurred by the United States in performing the Upper River Work pursuant to this Paragraph

shall be considered Upper River Future Response Costs that the Participating Parties shall pay

pursuant to Section XVI (Reimbursement of Response Costs).

-20-

e.　Either of the Participating Parties may invoke the procedures set forth in Section XIX (Dispute Resolution), Paragraph 72 (Formal Dispute Resolution), to dispute EPA's determination that takeover of the Upper River Work is warranted under Paragraph 11.c.i. of this Consent Decree.

f.　<u>Stipulated Penalties</u>.  Failure of the Settling Defendant to comply with the terms of this Paragraph shall trigger the accrual of stipulated penalties pursuant to Section XX (Stipulated Penalties).  In addition, if EPA disapproves a temporary contractor or permanent replacement for the Work Party proposed under Paragraph 12, stipulated penalties pursuant to Section XX (Stipulated Penalties) shall begin to accrue against the Settling Defendant on the date of the disapproval notice, although such penalties shall only become payable in the event that either:  (i) the Settling Defendant does not identify another proposed temporary contractor or permanent replacement for the Work Party for EPA approval within 10 days after notice of such disapproval by EPA; or (ii) the Settling Defendant timely proposes another temporary contractor or permanent replacement for the Work Party within 10 days after notice of disapproval by EPA, but EPA disapproves that entity as well.  The Settling Defendant also shall be jointly and severally liable under this Consent Decree for stipulated penalties for noncompliance owed by the Work Party or a temporary contractor. The stipulated penalties that may accrue against Settling Defendant and become payable pursuant to this Paragraph are in addition to any other stipulated penalties that may accrue pursuant to Section XX (Stipulated Penalties) of this Consent Decree and any other remedies that may be available to the United States.

-21-

12. <u>Replacement of the Work Party</u>

a. <u>Replacement of Work Party with Temporary Contractor.</u>  Within 20 days of the date of a Notice of Default requiring a temporary contractor pursuant to Paragraph 11.b., the Settling Defendant shall propose in writing, for EPA approval, a temporary contractor to perform the Upper River Work while the Settling Defendant arranges to retain a permanent replacement for the Work Party.  In this instance, the Work Party shall remain subject to all requirements of this Consent Decree, including stipulated penalties for noncompliance, until EPA provides written notification to the Participating Parties that EPA has authorized a temporary contractor to proceed and that the Work Party is dismissed from its responsibilities at the Site consistent with Paragraph 16.  The temporary contractor must begin performance of the Upper River Work within 10 working days of EPA's authorization to proceed or such other longer time period as specified by EPA.  The Settling Defendant may propose additional temporary contractors that are subject to EPA approval.

b. <u>Permanent Replacement of the Work Party.</u>

i. Within 65 days of the date of any Notice of Default under Paragraph 11, the Settling Defendant shall propose in writing, for EPA's prior written approval, a permanent replacement for the current Work Party in accordance with Paragraph 13.  EPA, in its unreviewable discretion, upon written request of the Settling Defendant, may extend such 65-day time period.  If the extension period requested by the Settling Defendant and approved by EPA exceeds 65 days, and a temporary contractor was not required by the Notice of Default issued pursuant to Paragraph 11.b., EPA may require the Settling Defendant to obtain a

-22-

temporary contractor to perform the Upper River Work while a permanent replacement for the Work Party is being identified.

        ii.      In the event that Settling Defendant decides to replace the Work Party even though EPA has not issued a Notice of Default under Paragraph 11, the Settling Defendant shall immediately notify EPA in writing of such decision, and at the same time propose in writing, for EPA's prior written approval, a permanent replacement for the current Work Party in accordance with Paragraph 13.

        iii.     If EPA approves the permanent replacement for the Work Party as proposed by the Settling Defendant pursuant to Paragraph 12.b.i. or ii., the Settling Defendant shall promptly thereafter provide EPA with the permanent replacement's executed signature page for this Consent Decree, and the United States and Settling Defendant shall then seek the Court's approval of the proposed permanent replacement pursuant to Paragraph 113 of this Consent Decree. The Work Party agrees not to oppose such request for Court approval. The Department of Justice shall notify the Settling Defendant of the Court's decision on the request for approval. On the tenth working day following the Court's approval: (i) the former Work Party shall be dismissed from its responsibilities at the Site, subject to the provisions of Paragraph 16; and (ii) the replacement Work Party shall be bound by, obligated to, and subject to the terms and conditions of this Consent Decree that are applicable to the Work Party. The Settling Defendant will be responsible for coordinating the transition of responsibility between the former Work Party and the replacement Work Party, to include providing for security at the Site and continuity of the Work. The replacement Work Party shall begin performance of the Upper River Work within 15 working days following the date of the Court's approval.

c.	In the event that a Work Party performing Upper River Work: (i) is found to be in Default pursuant to Paragraph 11.b.; (ii) is relieved of its responsibilities by the Settling Defendant pursuant to Paragraph 12.b.ii.; or (iii) otherwise withdraws or is dismissed from its capacity as Work Party under this Consent Decree; and such Work Party is not duly replaced in accordance with this Consent Decree, Settling Defendant shall become fully and solely responsible for implementation of the Upper River Work and for all other obligations pursuant to the Original Consent Decree, effective upon the issuance by the Court of an order granting the motion described in the next sentence of this paragraph. The United States will send the Settling Defendant a written notice (a "Notice of Reversion") of EPA's determination that an event specified in Paragraph 12.b.(i), (ii), or (iii) above has occurred, and at the same time will propose a joint motion of the United States and Settling Defendant (which the Work Party, without prejudice to its rights under the Liability Transfer and Assumption Agreement, hereby agrees not to oppose) seeking termination of this Consent Decree and reinstatement of the Original Consent Decree. The United States will file said joint motion together with a new schedule for implementation of the Upper River Work which will be prepared jointly by EPA and the Settling Defendant. Within 20 days of the date of the Notice of Reversion, Settling Defendant shall propose in writing, for EPA approval, a temporary contractor to perform the Upper River Work until such time as the Original Consent Decree is reinstated and a new Supervising Contractor begins work under the Original Consent Decree. The temporary contractor may become the new Supervising Contractor if proposed as such by Settling Defendant and approved by EPA. The Settling Defendant will be responsible for coordinating the transition of responsibility between the former Work Party and the Settling Defendant, to include providing for security at the Site

-24-

and continuity of the Upper River Work. Upon the date of issuance of the Court order terminating this Consent Decree and reinstating the Original Consent Decree, this Consent Decree shall be terminated and of no further force or effect, except as to those terms and provisions hereof that are expressly made to survive.

d. Unless otherwise authorized by EPA, the Work Party shall be replaced no more than three (3) times.

13. <u>Criteria for a Temporary Contractor or Permanent Replacement for the Work Party.</u> When proposing to EPA either a temporary contractor or a permanent replacement for the Upper River Work Party pursuant to this Section, Settling Defendant must submit in writing the proposed contractor's or replacement's qualifications and demonstrate that it has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting to EPA a copy of its Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA.

14. <u>Notice to Proposed Replacement for the Work Party</u>. Settling Defendant shall submit the following information to any potential permanent replacement for the Work Party:

a. a copy of this Consent Decree;

b. notice that any permanent replacement for the Work Party shall be subject to prior EPA approval; and

c. notice that any permanent replacement must agree to become bound by the

-25-

terms of this Consent Decree and assume the obligations of the Work Party (other than for penalties and costs that accrued prior to the effective date of the replacement) through execution of a signature page, which shall be an addendum to this Consent Decree and which shall constitute a material modification pursuant to Section XXXI (Modification) for which Court approval is required.

15.    Failure of a Work Party's Replacement to Become a Party to the Consent Decree. If the Court disapproves a proposed modification to the Consent Decree that provides for the Work Party's replacement, Settling Defendant shall, within 14 days of such disapproval, propose to EPA a new permanent replacement for the Work Party.  If issued an authorization to proceed by EPA, the new replacement contractor proposed by the Settling Defendant may perform the Upper River Work as a temporary contractor during the time required for court approval.

16.    a.    In the event that the Work Party is replaced in accordance with the provisions of Paragraph 12 above, the former Work Party shall thereafter no longer be considered liable pursuant to this Consent Decree for the implementation of the Upper River Work; provided that the former Work Party shall continue to comply with Sections XXIV (Access to Information), XXV (Retention of Records), and XVII (Indemnification and Insurance) (solely to the extent that such indemnification and insurance pertains to the period when the former Work Party was liable under the Consent Decree), and shall remain responsible for the payment of Future Response Costs under Section XVI (Reimbursement of Response Costs) (solely to the extent such costs were incurred during the period before the former Work Party was replaced) and stipulated penalties (solely to the extent assessed for noncompliance by the former Work

Party before it was replaced). The Settling Defendant is jointly and severally liable for any Future Response Costs and stipulated penalties owed by any former Work Party.

b. In the event that this Consent Decree is terminated and the Original Consent Decree is reinstated in accordance with the provisions of Paragraph 12.c., each former Work Party and the Settling Defendant shall continue to comply with Sections XXIV (Access to Information), XXV (Retention of Records), and XVII (Indemnification and Insurance), and shall remain responsible for the payment of Future Response Costs under Section XVI (Reimbursement of Response Costs), to the extent such costs were incurred under this Consent Decree, and stipulated penalties under Section XX (Stipulated Penalties), to the extent such penalties were assessed for noncompliance under this Consent Decree; provided, however, that with respect to each former Work Party, the foregoing continuing obligations shall apply solely to the extent that such obligations arose during such party's tenure as the "Work Party" under this Consent Decree. Pursuant to this Consent Decree and continuing after termination of this Consent Decree, the Settling Defendant is and shall remain jointly and severally liable for any Future Response Costs and stipulated penalties owed by any former Work Party or otherwise arising under this Consent Decree.

## VII. PERFORMANCE OF THE UPPER RIVER WORK BY THE PARTICIPATING PARTIES

Selection of Supervising Contractor.

17. All aspects of the Upper River Work to be performed by the Participating Parties pursuant to Sections VI (Retention of a Work Party/Work Takeover), VII (Performance of the Upper River Work by Participating Parties), VIII (Quality Assurance, Sampling and Data

-27-

Analysis), and XV (Emergency Response) of this Consent Decree shall be under the direction and supervision of the Supervising Contractor. URS has been approved by EPA as Supervising Contractor.

18.     If the Participating Parties propose to change the Supervising Contractor, the Participating Parties shall submit in writing the proposed contractor's qualifications and demonstrate that it has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting to EPA a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA. After receiving this information, EPA promptly will issue a notice of disapproval or an authorization to proceed. The Participating Parties must obtain an authorization to proceed from EPA before the new Supervising Contractor performs, directs, or supervises any Upper River Work under this Consent Decree.

19.     <u>Upper River Remedial Design</u>.

        a.      EPA authorized URS to proceed with the Remedial Design on January 26, 2004. The Participating Parties submitted to EPA and the State a work plan for the design of the Upper River Remedial Action at the Site ("Upper River Remedial Design Work Plan" or "URRD Work Plan"). The Upper River Remedial Design Work Plan was approved by EPA and is incorporated into and enforceable under this Consent Decree. The Participating Parties also submitted to EPA and the State a Health and Safety Plan for field design activities which

-28-

conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

b.      The URRD Work Plan shall include plans and schedules for implementation of all remedial design and pre-design tasks identified in the URSOW. The plan shall document the responsibility and authority of all organizations and key personnel involved with the design and shall include a description of qualifications of key personnel directing the Remedial Design, including contractor personnel.  The URRD Work Plan shall include a project schedule for each major activity and submission of deliverables generated during the Remedial Design.  The URRD Work Plan shall include, at a minimum, a pre-design QAPP and a Field Sampling Plan.  As part of the Upper River Remedial Design Work Plan, the Participating Parties shall discuss how each component of the Upper River remedy will be addressed individually.

c.      Upon approval of the Upper River Remedial Design Work Plan by EPA, after a reasonable opportunity for review and comment by the State, and submittal of the Health and Safety Plan for all field activities to EPA and the State, or upon entry of this Consent Decree, whichever is later, the Participating Parties shall implement the Upper River Remedial Design Work Plan.  The Participating Parties shall submit to EPA and the State all plans, submittals and other deliverables required under the approved Upper River Remedial Design Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans and Other Submissions).  Unless otherwise directed by EPA, the Participating Parties shall not commence further Remedial Design activities at the Site prior to approval of the Upper River Remedial Design Work Plan.

d.      The 50% design submittal for each phase of the Upper River Remedial Action shall include, at a minimum, the following:  (i) results of additional field sampling; (ii) design assumptions and parameters, including design restrictions, process performance criteria, appropriate unit processes for the treatment train, and expected removal or treatment efficiencies for both the process and waste (concentration and volume), as applicable; (iii) Sediment Removal Verification Plan (in appropriate phase), including the proposed cleanup verification methods (i.e., probing methods) and compliance with Applicable or Relevant and Appropriate Requirements (ARARs); (iv) outline of required specifications; (v) proposed siting/locations of processes/construction activity; (vi) Mitigation Plan to restore habitats that have been physically impacted by sediment removal or soil excavation equipment (not including the soft sediment deposits themselves); (vii) expected long-term monitoring and operation requirements; (viii) real estate, easement, and permit requirements; (ix) preliminary construction schedule, including contracting strategy.  Any value engineering proposals must be identified and evaluated during this review.

e.      The final design submittal for each phase of the Upper River Remedial Action shall include, at a minimum, the elements identified in Paragraph 11.d. (above) and the following:  (i) final Field Sampling Plan; (ii) draft Construction Quality Assurance Project Plan (CQAPP); (iii) final H & S Plan; (iv) final Sediment Removal Verification Plan (in appropriate phase); (iv) draft Operation and Maintenance Plan; (v) Contingency Plan; (vi) Capital and Operation and Maintenance Cost Estimate (which shall refine the FS cost estimate to reflect the detail presented in the final design); (vii) final project schedule for the construction and implementation of the Remedial Action which identifies timing for initiation and completion of

-30-

all critical path tasks. The final project schedule submitted as part of the final design shall include specific dates for completion of the project and major milestones. The CQAPP, which shall detail the approach to quality assurance during construction activities at the Site, shall specify a quality assurance official ("QA Official"), independent of the Supervising Contractor, to conduct a quality assurance program during the construction phases of the project.

      20.   <u>Upper River Remedial Action</u>.

      a.   Within 60 days after receipt of EPA's approval of the final design submittal for the relevant phase of the Upper River Remedial Action, the Participating Parties shall award the principal remedial action contract(s) for that phase. Within 150 days after receipt of EPA's approval of that final design submittal, the Participating Parties shall submit to EPA and the state a work plan for the performance of that phase of the Upper River Remedial Action at the Site ("Upper River Remedial Action Work Plan"), which shall plainly identify the phase of work it addresses. The Upper River Remedial Action Work Plan shall provide for construction and implementation of that phase of the Upper River remedy and achievement of the Performance Standards in accordance with this Consent Decree, the URSOW, and the design plans and specifications developed in accordance with the Upper River Remedial Design Work Plan and approved by EPA. Upon its approval by EPA, the Upper River Remedial Action Work Plan shall be incorporated into and become enforceable under this Consent Decree. At the same time as they submit the Upper River Remedial Action Work Plan, the Participating Parties shall submit to EPA a Health and Safety Plan for field activities required by the Upper River Remedial Action Work Plan which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

-31-

b.       The Upper River Remedial Action Work Plan for each phase of the Upper River Remedial Action shall include the following: (i) the schedule for completion of that phase; (ii) the schedule for developing and submitting other required plans for that phase; (iii) final Construction Quality Assurance Plan; (iv) methods for satisfying any applicable permitting requirements; (v) methodology for implementation of the Contingency Plan; (vi) tentative formulation of the Upper River Remedial Action Project team; (vii) construction quality control plan (by constructor); and (viii) procedures and plans for the decontamination of equipment and the disposal of contaminated materials.  The Upper River Remedial Action Work Plan for each phase also shall include a schedule for implementation of all Upper River Remedial Action tasks identified in the final design submittal, and shall identify the initial formulation of the Participating Parties' Remedial Action Project Team (including but not limited to Supervising Contractor).

c.       Upon approval of the pertinent Upper River Remedial Action Work Plan by EPA, after a reasonable opportunity for review and comment by the State, the Participating Parties shall implement the activities required under the approved Plan.  The Participating Parties shall submit to EPA and the State all plans, submittals, or other deliverables required under the approved Upper River Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section XI (EPA Approval of Plans and Other Submissions). Unless otherwise directed by EPA, the Participating Parties shall not commence physical Upper River Remedial Action activities at the Site prior to approval of the pertinent Upper River Remedial Action Work Plan.

-32-

21.    a.    The Participating Parties shall continue to implement the Upper River Remedial Action and O&M until the Performance Standards are achieved and for so long thereafter as is otherwise required under this Consent Decree.

b.    Technical Impracticability Modification of Performance Standards.

i.    Petition.  For purposes of this Consent Decree and the Upper River Work, the Participating Parties may petition EPA to modify the 88% PCB mass removal or 0.5 ppm surface weighted average PCB concentration ("SWAC") Performance Standards contained in the Upper River sections of the ROD and URSOW.  Settling Defendant's petition shall include:  (1) an identification of the Performance Standard for which a modification is sought; (2) a detailed justification setting forth the technical basis for the claim that it is technically impracticable to achieve the Performance Standard through soft sediment dredging, based on data from the Upper River Work and any other relevant information; (3) a proposed alternative Performance Standard; and (4) a demonstration that the Upper River Work and/or any alternative cleanup standards at the Site, together with any additional response actions taken or proposed to be taken by Settling Defendant in the petition, will attain overall protection of human health and the environment and the other Performance Standards in the Upper River sections of the ROD and URSOW.

ii.    Determination.  Based on its review of the petition and the supporting documentation submitted by Settling Defendant pursuant to Paragraph 21.b.i. above and other relevant information, and after notice and an opportunity for the State to review and comment on any proposed modification under this Paragraph, EPA will determine whether to modify any Performance Standards contained in the Upper River Sections of the ROD and

-33-

URSOW and will identify any new Performance Standards to be attained. The determination

shall be made in accordance with all applicable laws and regulations in effect at the time of the

petition. Any alternative Performance Standard selected by EPA pursuant to this Paragraph shall

meet the requirements of CERCLA and the NCP, including protection of human health and the

environment. If EPA grants any petition pursuant to this Paragraph, the URSOW shall be

modified in accordance with Section XXXI of this Consent Decree (Modification) to include any

alternative Performance Standard established. If EPA fails to provide a written determination

within 120 days of the receipt of Settling Defendant's petition, the petition shall be considered

denied, unless EPA and Settling Defendant agree to extend this period.

                iii.      Review. Settling Defendant may challenge EPA's determination

under Paragraph 21.b.ii. above in accordance with the Dispute Resolution provisions in

Paragraph 72 of this Consent Decree.

      22.      <u>Modification of the URSOW or Related Work Plans</u>.

        a.      If EPA determines, after reasonable opportunity for review and comment

by the State, that modification to the Upper River Work specified in the URSOW and/or in work

plans developed pursuant to the URSOW is necessary to achieve and maintain the Performance

Standards or to carry out and maintain the effectiveness of the remedy set forth in the Upper

River Sections of the ROD (as further delineated in the URSOW), EPA may require that such

modification be incorporated in the URSOW and/or such work plans, provided, however, that a

modification may only be required pursuant to this Paragraph to the extent that it is consistent

with the scope of the remedy in the Upper River Sections of the ROD (as further delineated in

the URSOW).

-34-

b.        For the purposes of this Paragraph and Paragraph 55, the "scope of the remedy in the Upper River Sections of the ROD (as further delineated in the URSOW)" consists of:  (i) re-characterizing the Upper River soft sediments and removing a minimum of 88 percent of the remaining PCB mass in the soft sediment deposits (through dredging or excavation) to achieve a soft sediment surface weighted average PCB concentration of less than or equal to 0.5 ppm (or any alternative performance standard established under Paragraph 21.b.); (ii) excavating and disposing of flood plain soils in areas FPR-3, FPL-4, FPR-5, FPR-6, FPR-7, and FPL-8 containing PCB concentrations greater than 10 ppm; (iii) removing or controlling remaining PCB sources to the river, including sources at the former Tecumseh Products Plant, the river bank soils and near-shore sediments with significantly elevated PCB concentrations as described in the URSOW; (iv) long-term monitoring of Plant ground-water; and (v) if EPA determines that ground-water at the Tecumseh Plant is discharging PCBs to the Sheboygan River, and natural attenuation is not appropriate as a final ground-water remedy, implementing a ground-water collection and treatment system.

c.        If the Participating Parties object to any modification determined by EPA to be necessary pursuant to this Paragraph, they may seek dispute resolution pursuant to Section XIX (Dispute Resolution).  The standard of review shall be that set forth in Paragraph 72 (record review).  The URSOW and/or related work plans shall be modified in accordance with final resolution of the dispute.

d.        The Participating Parties shall implement any Upper River Work required by any modifications incorporated in the URSOW and/or in work plans developed pursuant to the URSOW in accordance with this Paragraph.

e.     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

23.     The Participating Parties acknowledge and agree that nothing in this Consent Decree, the URSOW, or the Upper River Remedial Design or Upper River Remedial Action Work Plans constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the URSOW and the Work Plans will achieve the Performance Standards.

24.     a.     The Participating Parties shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material.  However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

i.     The Participating Parties shall include in the written notification the following information, where available:  (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation.  The Participating Parties shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

ii.     The identity of the receiving facility and state will be determined by the Participating Parties following the award of the contract for Upper River Remedial Action

-36-

construction.  The Participating Parties shall provide the information required by Paragraph 24.a.i. as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

b.    Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, the Participating Parties shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3) and 40 C.F.R. 300.440.  The Participating Parties shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulations cited in the preceding sentence.

## VIII.  QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

25.    The Participating Parties shall use quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance and monitoring samples in accordance with "EPA Requirements for Quality Assurance Project Plans (QA/R5)" (EPA/240/B-01/003, March 2001) "Guidance for Quality Assurance Project Plans (QA/G-5)" (EPA/600/R-98/018, February 1998), and subsequent amendments to such guidelines upon notification by EPA to the Participating Parties of such amendment.  Amended guidelines shall apply only to procedures conducted after such notification.  Prior to the commencement of any monitoring project under this Consent Decree, the Participating Parties shall submit to EPA for approval, after a reasonable opportunity for review and comment by the State, a Quality Assurance Project Plan ("QAPP") that is consistent with the URSOW, the NCP and applicable guidance documents.  If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without

-37-

objection, in any proceeding under this Decree. The Participating Parties shall ensure that EPA personnel and its authorized representatives are allowed access at reasonable times to all laboratories utilized by the Participating Parties in implementing this Consent Decree. In addition, the Participating Parties shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring. The Participating Parties shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Decree perform all analyses according to accepted EPA methods. Accepted EPA methods consist of those methods which are documented in the "Contract Lab Program Statement of Work for Inorganic Analysis" and the "Contract Lab Program Statement of Work for Organic Analysis," dated February 1988, and any amendments made thereto during the course of the implementation of this Decree; however, upon approval by EPA, after opportunity for review and comment by the State, the Participating Parties may use other analytical methods which are as stringent as or more stringent than the CLP- approved methods. The Participating Parties shall ensure that all laboratories they use for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent QA/QC program. The Participating Parties shall only use laboratories that have a documented Quality System which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program ("NELAP") as meeting the Quality System requirements. The Participating Parties shall ensure that all field

Case 1:03-cv-00401-WCG    Filed 01/09/06    Page 40 of 98    Document 21

methodologies utilized in collecting samples for subsequent analysis pursuant to this Consent Decree will be conducted in accordance with the procedures set forth in the QAPP approved by EPA.

26.     Upon request, the Participating Parties shall allow split or duplicate samples to be taken by EPA or its authorized representatives.  The Participating Parties shall notify EPA not less than 14 days in advance of any sample collection activity unless shorter notice is agreed to by EPA.  In addition, EPA shall have the right to take any additional samples that EPA deems necessary.  Upon request, EPA shall allow the Participating Parties to take split or duplicate samples of any samples it takes as part of the Plaintiff's oversight of the Participating Parties' implementation of the Upper River Work.

27.     The Participating Parties shall submit to EPA four paper copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of the Participating Parties with respect to the Site and/or the implementation of this Consent Decree unless EPA agrees otherwise.  Upon prior approval by EPA, the Participating Parties may submit one electronic copy of the data obtained or generated by or on behalf of the Participating Parties with respect to the Site and/or the implementation of this Consent Decree in lieu of the paper copies. EPA shall timely provide to the Participating Parties one copy of the results of all sampling and/or tests or other data obtained or generated by or on behalf of EPA with respect to the implementation of this Consent Decree.

28.     Notwithstanding any provision of this Consent Decree, the United States hereby retains all of its information gathering and inspection authorities and rights, including

-39-

enforcement actions related thereto, under CERCLA, RCRA and any other applicable statutes or regulations.

## IX. ACCESS AND INSTITUTIONAL CONTROLS

29.     If the Site, or any other property where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by one or more of the Participating Parties, the relevant Participating Party or Parties shall:

a.     Commencing on the date of lodging of this Consent Decree, provide the United States and its representatives, including EPA and its contractors, and WDNR and its representatives, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, the following activities:

i.     Monitoring the Upper River Work;

ii.     Verifying any data or information submitted to the United States;

iii.     Conducting investigations relating to contamination at or near the Site;

iv.     Obtaining samples;

v.     Assessing the need for, planning, or implementing additional response actions at or near the Site;

vi.     Assessing implementation of quality assurance and quality control practices as defined in the approved Quality Assurance Project Plans;

vii.     Implementing the Upper River Work pursuant to the conditions set forth in Paragraph 11.c. of this Consent Decree;

-40-

viii.    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by the Participating Parties or their agents, consistent with Section XXIV (Access to Information);

ix.    Assessing the Participating Parties' compliance with this Consent Decree; and

x.    Determining whether the Site or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree;

b.    Commencing on the date of lodging of this Consent Decree, refrain from using the Site, or such other property, in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedial measures to be performed pursuant to this Consent Decree.  Such restrictions include, but are not limited to, dredging of sediments or construction in the Upper River without EPA approval; and

c.    Execute and record in the Register of Deeds Office in Sheboygan County, State of Wisconsin , an easement, running with the land, that:  (i) grants a right of access for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Paragraph 29.a. of this Consent Decree; and (ii) grants the right to enforce the land/water use restrictions listed in Paragraph 29.b. of this Consent Decree, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the remedial measures to be performed pursuant to this Consent Decree.  The Participating Parties shall grant the access rights and the rights to enforce the land/water use restrictions to the United States, on behalf of EPA and its representatives, and the

-41-

State and its representatives. The Participating Parties shall, if EPA so requests, within 45 days of such request, submit to EPA for review and approval with respect to such property:

i. A draft easement that is enforceable under the laws of the State of Wisconsin, and

ii. A current title insurance commitment or some other evidence of title acceptable to EPA, which shows title to the land described in the easement to be free and clear of all prior liens and encumbrances (except any utility easements or rights of way, or any conservation easements, or when those liens or encumbrances are approved by EPA or when, despite best efforts, the Participating Parties are unable to obtain release or subordination of such prior liens or encumbrances).

30. Within 30 days of EPA's approval and acceptance of the easement and the title evidence, the Participating Parties shall update the title search and, if it is determined that nothing has occurred to affect the title adversely since the effective date of the commitment, record the easement with the Register of Deeds Office in Sheboygan County. Within 30 days of recording the easement, the Participating Parties shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement showing the clerk's recording stamps. If the easement is to be conveyed to the United States, the easement and title evidence (including final title evidence) shall be prepared in accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title must be obtained as required by 40 U.S.C. § 255.

31.     If the Site, or any other property where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by persons other than the Participating Parties, the Participating Parties shall use best efforts to secure from such persons:

a.     Agreements to provide access thereto for the Participating Parties, as well as for the United States on behalf of EPA, as well as their representatives (including contractors), and the State, for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Paragraph 29.a. of this Consent Decree;

b.     Agreements, enforceable by the Participating Parties and the United States, to refrain from using the Site, or such other property, in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedial measures to be performed pursuant to this Consent Decree.  Such restrictions include, but are not limited to, dredging of sediments or construction in the Upper River or at the former plant site without notice and approval by EPA; and

c.     The execution and recording in the Register of Deeds Office in Sheboygan County, State of Wisconsin, of an easement, running with the land, that:  (i) grants a right of access for the purpose of conducting any activity related to this Consent Decree including, but not limited to, those activities listed in Paragraph 29.a. of this Consent Decree; and (ii) grants the right to enforce the land/water use restrictions listed in Paragraph 29.b. of this Consent Decree, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the remedial measures to be performed pursuant to this Consent Decree.  The access rights and/or rights to enforce land/water use restrictions shall be

-43-

granted to: (i) the United States, on behalf of EPA, and its representatives; (ii) the State and its representatives; or (iii) other appropriate grantees.

        d.      Within 90 days after the submission date of the relevant 50% design submittal for each phase of the Upper River Remedial Action as required by this Consent Decree, the Participating Parties shall submit to EPA for review and approval with respect to all property not owned by the Participating Parties included in that phase:

             i.      A draft easement that is enforceable under the laws of the State of Wisconsin, and

             ii.      A current title insurance commitment, or some other evidence of title acceptable to EPA, which shows title to the land described in the easement to be free and clear of all prior liens and encumbrances (except any utility easements or rights of way, or any conservation easements, or when those liens or encumbrances are approved by EPA or despite best efforts, the Participating Parties are unable to obtain release or subordination of such prior liens or encumbrances).

Within 30 days of EPA's approval and acceptance of the easement and the title evidence, the Participating Parties shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment to affect the title adversely, record the easement with the Register of Deeds Office in Sheboygan County. Within 30 days of the recording of the easement, the Participating Parties shall provide EPA with a final title insurance policy, or other final evidence of title acceptable to EPA, and a certified copy of the original recorded easement showing the clerk's recording stamps. If easement is to be conveyed to the United States, the easement and title evidence (including final title evidence) shall be prepared in

accordance with the U.S. Department of Justice Title Standards 2001, and approval of the sufficiency of title must be obtained as required by 40 U.S.C. § 255.

32.     If:  (i) any access or land/water use restriction agreements required by Paragraphs 29.a. or 29.b. of this Consent Decree are not obtained within 90 days after the submission date of the relevant 50% design submittal for that phase of the Upper River Remedial Action as required by this Consent Decree; (ii) any access easements or restrictive easements required by Paragraph 29.c. of this Consent Decree are not submitted to EPA in draft form within 90 days after the submission date of the relevant 50% design submittal for that phase of the Upper River Remedial Action as required by this Consent Decree; or (iii) the Participating Parties are unable to obtain an agreement pursuant to Paragraph 29.c.i. or Paragraph 31.d.i. from the holder of a prior lien or encumbrance to release or subordinate such lien or encumbrance to the easement being created pursuant to this Consent Decree within 90 days after the submission date of the relevant 50% design submittal for that phase of the Upper River Remedial Action as required by this Consent Decree, the Participating Parties shall promptly notify the United States in writing, and shall include in that notification a summary of the steps that the Participating Parties have taken to attempt to comply with Paragraphs 29 and 31 of this Consent Decree.  The United States may, as it deems appropriate, assist the Participating Parties in obtaining access or land/water use restrictions, either in the form of contractual agreements or in the form of easements running with the land, or in obtaining the release or subordination of a prior lien or encumbrance.  The Participating Parties shall reimburse the United States in accordance with the procedures in Section XVI (Reimbursement of Response Costs), for all response costs incurred, direct or indirect, by the United States in obtaining such access, land/water use restrictions, and/or the

release/subordination of prior liens or encumbrances including, but not limited to, the cost of attorney time and the amount of just compensation.

33.     If EPA determines that land/water use restrictions in the form of state or local laws, regulations, ordinances or other governmental controls are needed to implement the remedy selected in the ROD, ensure the integrity and protectiveness thereof, or ensure non-interference therewith, the Participating Parties agree not to oppose EPA's efforts to secure such governmental controls.

34.     Notwithstanding any provision of this Consent Decree, the United States retains all of its access authorities and rights, as well as any rights it might have to require land/water use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA and any other applicable statute or regulations.

## X.  REPORTING REQUIREMENTS

35.     In addition to any other requirement of this Consent Decree, the Participating Parties shall submit to EPA and the State two copies of written monthly progress reports that: (i) describe the actions which have been taken toward achieving compliance with this Consent Decree during the previous month; (ii) include a summary of all results of sampling and tests and all other data that have undergone appropriate QA/QC under Section VIII of this Consent Decree (Quality Assurance Sampling and Data Analysis) and that were received or generated by the Participating Parties or their contractors or agents in the previous month; (iii) identify all work plans, plans and other deliverables required by this Consent Decree completed and submitted during the previous month; (iv) describe all actions, including, but not limited to, data collection and implementation of work plans, which are scheduled for the next six weeks and provide other

-46-

information relating to the progress of construction, including, but not limited to, critical path diagrams, Gantt charts and Pert charts; (v) include information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Upper River Work, and a description of efforts made to mitigate those delays or anticipated delays; (vi) include any modifications to the work plans or other schedules that the Participating Parties have proposed to EPA or that have been approved by EPA; and (vii) describe all activities undertaken in support of the Community Relations Plan during the previous month and those to be undertaken in the next six weeks. The Participating Parties shall submit these progress reports to EPA and the State by the fifteenth day of every month following the entry of this Consent Decree until EPA notifies the Participating Parties pursuant to Paragraph 55.c. of Section XIV(Notification of Completion). Upon prior approval by EPA, the Participating Parties may submit one electronic copy of the reports required under this Paragraph in lieu of the paper copies. If requested by EPA, the Participating Parties shall also provide briefings for EPA to discuss the progress of the Upper River Work.

36. The Participating Parties shall notify EPA of any change in the schedule described in the monthly progress report for the performance of any activity, including, but not limited to, data collection and implementation of work plans, no later than seven days prior to the performance of the activity.

37. Upon the occurrence of any event during performance of the Upper River Work that Participating Parties are required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act ("EPCRA"), 42 U.S.C. § 11004, the Participating Parties shall within 24 hours of the onset of

-47-

such event orally notify the EPA Project Coordinator or the Alternate EPA Project Coordinator (in the event of the unavailability of the EPA Project Coordinator), or, in the event that neither the EPA Project Coordinator or Alternate EPA Project Coordinator is available, the Emergency Response Section, Region 5, United States Environmental Protection Agency. These reporting requirements are in addition to the reporting required by CERCLA Section 103 or EPCRA Section 304.

38.     Within 20 days of the onset of such an event, the Participating Parties shall furnish to Plaintiff a written report, signed by the Participating Parties' Project Coordinator, setting forth the events which occurred and the measures taken, and to be taken, in response thereto. Within 30 days of the conclusion of such an event, the Participating Parties shall submit a report setting forth all actions taken in response thereto.

39.     The Participating Parties shall submit four copies of draft and three copies of final plans, reports, and data required by the URSOW, the Upper River Remedial Design Work Plan, the Upper River Remedial Action Work Plan, or any other approved plans to EPA in accordance with the schedules set forth in such plans. Upon prior approval by EPA, the Participating Parties may submit one electronic copy of the reports required under this Paragraph in lieu of the paper copies.

40.     All reports and other documents submitted by the Participating Parties to EPA (other than the monthly progress reports referred to above) which purport to document the Participating Parties' compliance with the terms of this Consent Decree shall be signed by an authorized representative of the Participating Parties.

-48-

## XI.  EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

41.     After review of any plan, report or other item which is required to be submitted

for approval pursuant to this Consent Decree, EPA, after reasonable opportunity for review and

comment by the State, shall:  (i) approve, in whole or in part, the submission; (ii) approve the

submission upon specified conditions; (iii) modify the submission to cure the deficiencies; (iv)

disapprove, in whole or in part, the submission, directing that the Participating Parties modify the

submission; or (v) any combination of the above.  However, EPA shall not modify a submission

without first providing the Participating Parties at least one notice of deficiency and an

opportunity to cure within 60 days, except where to do so would cause serious disruption to the

Upper River Work or where previous submission(s) have been disapproved due to material

defects and the deficiencies in the submission under consideration indicate a bad faith lack of

effort to submit an acceptable deliverable.

42.     In the event of approval, approval upon conditions, or modification by EPA

pursuant to Paragraph 41(i), (ii), or (iii), the Participating Parties shall proceed to take any action

required by the plan, report, or other item, as approved or modified by EPA subject only to their

right to invoke the Dispute Resolution procedures set forth in Section XIX (Dispute Resolution)

with respect to the modifications or conditions made by EPA.  In the event that EPA modifies the

submission to cure the deficiencies pursuant to Paragraph 41(iii) and the submission has a

material defect, EPA retains its right to seek stipulated penalties, as provided in Section XX

(Stipulated Penalties).

43.     Resubmission of Plans.

      a.     Upon receipt of a notice of disapproval pursuant to Paragraph 41, the

-49-

Participating Parties shall, within 60 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission, as provided in Section XX (Stipulated Penalties), shall accrue during the 60-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 44 and 45.

       b.     Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 41, the Participating Parties shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve the Participating Parties of any liability for stipulated penalties under Section XX (Stipulated Penalties).

      44.     In the event that a resubmitted plan, report or other item, or portion thereof, is disapproved by EPA, EPA may again require the Participating Parties to correct the deficiencies, in accordance with the preceding Paragraphs. EPA also retains the right to modify or develop the plan, report or other item. The Participating Parties shall implement any such plan, report, or item as modified or developed by EPA, subject only to its right to invoke the procedures set forth in Section XIX (Dispute Resolution).

      45.     If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, the Participating Parties shall be deemed to have failed to submit such plan, report, or item timely and adequately unless the Participating Parties invokes the dispute resolution procedures set forth in Section XIX (Dispute Resolution) and EPA's action is overturned pursuant to that Section. The provisions of Section XIX (Dispute Resolution) and

-50-

Section XX (Stipulated Penalties) shall govern the implementation of the Upper River Work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is upheld, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XX.

46.     All plans, reports, and other items required to be submitted to EPA under this Consent Decree shall, upon approval or modification by EPA, be enforceable under this Consent Decree. In the event EPA approves or modifies a portion of a plan, report, or other item required to be submitted to EPA under this Consent Decree, the approved or modified portion shall be enforceable under this Consent Decree.

## XII. PROJECT COORDINATORS

47.     a.     Within 20 days of entry this Consent Decree, EPA will notify the Participating Parties, in writing, of the name, address and telephone number of its designated Project Coordinator and Alternate Project Coordinator, and the Participating Parties will notify EPA, in writing, of the name, address and telephone number of their designated Alternate Project Coordinator.

b.     If a Project Coordinator or Alternate Project Coordinator initially designated is changed, the identity of the successor will be given to the other Parties at least 5 working days before the changes occur, unless impracticable, but in no event later than the actual day the change is made. The Participating Parties' Project Coordinator shall be subject to prior written approval by EPA and shall have the technical expertise sufficient to adequately oversee all aspects of the Upper River Work. The Participating Parties' Project Coordinator shall not be an attorney for either of the Participating Parties in this matter. He or she may assign other

representatives, including other contractors, to serve as a Site representative for oversight of performance of daily operations during remedial activities.

48.     Plaintiff may designate other representatives, including, but not limited to, EPA employees, and federal contractors and consultants and WDNR and its representatives, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. EPA's Project Coordinator and Alternate Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager (RPM) and an On-Scene Coordinator (OSC) by the National Contingency Plan, 40 C.F.R. Part 300.  In addition, EPA's Project Coordinator or Alternate Project Coordinator shall have authority, consistent with the National Contingency Plan, to halt any Upper River Work required by this Consent Decree and to take any necessary response action when s/he determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare or the environment due to release or threatened release of Waste Material.

49.     EPA's Project Coordinator and the Participating Parties' Project Coordinator will meet during active field work periods, at a minimum, on a monthly basis.

### XIII. ASSURANCE OF ABILITY TO COMPLETE UPPER RIVER WORK

50.     During the term of this Consent Decree, at least one of the Participating Parties shall maintain financial security in the amount of $28 million (as such amount may be adjusted from time to time in accordance with this Section XIII) in one or more of the following forms, to ensure the full and final completion of the Upper River Work by the Participating Parties:

        a.      A surety bond;

-52-

b.      One or more irrevocable letters of credit, payable to or at the direction of EPA;

c.      A trust fund;

d.      An insurance policy;

e.      A corporate guarantee to perform the Upper River Work by one or more parent corporations or subsidiaries of, or by one or more unrelated companies that have a substantial business relationship with, at least one of the Participating Parties, including a demonstration that it or they satisfy(ies) the financial test requirements of 40 C.F.R. Part 264.143(f);

f.      A demonstration that at least one of the Participating Parties satisfies the financial test of 40 C.F.R. Part 264.143(f) with respect to the cost of the Upper River Work; or

g.      Any other method acceptable to EPA.

51.     In furtherance of the requirement of Paragraph 50, the Participating Parties have obtained a Manuscript Remediation Cost Cap insurance policy (Number 3730-86-51) from the Chubb Group of Insurance Companies (issued specifically by Chubb Custom Insurance Company) with an overall coverage limit of $100 million.  Pursuant to an amended and restated version of the policy, entitled "Financial Assurance Endorsement and Restated Contract" and dated November 15, 2004, certain funds under the policy have been established as financial assurance for the benefit of EPA in the event of a work takeover to ensure the completion of the Upper River Work.  EPA has reviewed and accepted the insurance policy as provided in a letter from Richard Nagle to Steven Jawetz dated November 22, 2002.

-53-

52.     If the Participating Parties seek to demonstrate the ability to complete the Upper River Work through a guarantee by a third party pursuant to Paragraph 50.d. of this Consent Decree, the Participating Parties shall demonstrate that the guarantor satisfies the requirements of 40 C.F.R. § 264.143(f).  If one or more of the Participating Parties seeks to demonstrate its ability to complete the Upper River Work by means of the financial test or the corporate guarantee pursuant to Paragraph 50.f. or 50.e., it shall resubmit a sworn statement conveying the information required by 40 C.F.R. § 264.143(f) annually, within 30 days of the anniversary of the Effective Date.  In the event that EPA determines at any time that the financial assurances provided pursuant to this Section are inadequate, the Participating Parties shall, within 30 days of receipt of notice of EPA's determination, obtain and present to EPA for approval one of the other forms of financial assurance listed in Paragraph 50 of this Consent Decree.  The Participating Parties' inability to demonstrate financial ability to complete the Upper River Work shall not excuse performance of any activities required under this Consent Decree.

53.     If the Participating Parties can show that the estimated cost to complete the remaining Upper River Work has diminished below the amount set forth in Paragraph 50 above after entry of this Consent Decree, the Participating Parties may, on any anniversary date of entry of this Consent Decree, or at any other time agreed to by the Participating Parties and the United States, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining Upper River Work to be performed.  The Participating Parties shall submit a proposal for such reduction to EPA, in accordance with the requirements of this Section, and may reduce the amount of the security upon approval by EPA.  In the event of a dispute, the

-54-

Participating Parties may reduce the amount of the security in accordance with the final administrative or judicial decision resolving the dispute.

54.     The Participating Parties may change the form of financial assurance provided under this Section at any time, upon notice to and approval by EPA, provided that the new form of assurance meets the requirements of this Section.  In the event of a dispute, the Participating Parties may change the form of the financial assurance only in accordance with the final administrative or judicial decision resolving the dispute.

## XIV.  NOTIFICATION OF COMPLETION

55.     <u>Completion of the Upper River Work</u>.

a.     Within 90 days after the Participating Parties conclude that all phases of the Upper River Work (including Upper River O & M), have been fully performed, the Participating Parties shall schedule and conduct a pre-completion inspection to be attended by the Participating Parties and EPA. EPA shall notify the State of the date the pre-completion inspection is scheduled and give the State the opportunity to attend.  If, after the pre-completion inspection, the Participating Parties still believe that the Upper River Work has been fully performed, the Participating Parties shall submit a written report by a registered professional engineer stating that the Upper River Work has been completed in full satisfaction of the requirements of this Consent Decree.  The report shall contain the following statement, signed by a responsible corporate official of  the Participating Parties or the Participating Parties' Project Coordinator:

To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

b. If, after review of the written report, EPA, after reasonable opportunity to review and comment by the State, determines that any portion of the Upper River Work has not been completed in accordance with this Consent Decree, EPA will notify the Participating Parties in writing of the activities that must be undertaken by the Participating Parties pursuant to this Consent Decree to complete the Upper River Work. Provided, however, that EPA may only require the Participating Parties to perform such activities pursuant to this Paragraph to the extent that such activities are consistent with the "scope of the remedy in the Upper River Sections of the ROD (as further delineated in the URSOW)," as that term is defined in Paragraph 22.b. EPA will set forth in the notice a schedule for performance of such activities consistent with the Consent Decree, the ROD, and the URSOW or require the Participating Parties to submit a schedule to EPA for approval pursuant to XI (EPA Approval of Plans and Other Submissions). The Participating Parties shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to their right to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution). Within 90 days after the Participating Parties conclude that the Upper River Work (including Upper River O & M and the activities required by EPA pursuant to this Paragraph), has been fully performed, the Participating Parties shall schedule and conduct another pre-completion inspection.

c. If EPA concludes, based on the initial or any subsequent request for

-56-

Notification of Completion by the Participating Parties and after a reasonable opportunity for review and comment by the State, that the Upper River Work has been performed in accordance with this Consent Decree, EPA will so notify the Participating Parties in writing.

## XV. EMERGENCY RESPONSE

56.    In the event of any action or occurrence during the performance of the Upper River Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, the Participating Parties shall, subject to Paragraph 57, immediately take all appropriate action to prevent, abate, or minimize such release or threat of release, and shall immediately notify the EPA's Project Coordinator, or, if the Project Coordinator is unavailable, EPA's Alternate Project Coordinator.  If neither of these persons is available, the Participating Parties shall notify EPA Region 5.  The Participating Parties shall take such actions in consultation with EPA's Project Coordinator or other available authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to the URSOW.  In the event that the Participating Parties fail to take appropriate response action as required by this Section, and EPA takes such action instead, the Participating Parties shall reimburse EPA all costs of the response action not inconsistent with the NCP pursuant to Section XVI (Reimbursement of Response Costs).

57.    Nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of the United States to:  (i) take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release

of Waste Material on, at, or from the Site; or (ii) direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, subject to Section XXI (Covenants Not to Sue by Plaintiff).

## XVI. REIMBURSEMENT OF RESPONSE COSTS

58. <u>Payments for Past Response Costs</u>. Tecumseh has paid to EPA approximately $2,100,000.00 for deposit into the Superfund, as reimbursement for Past Response Costs.

59. <u>Payments for Upper River Future Response Costs</u>.

a. The Participating Parties shall pay to EPA all Upper River Future Response Costs not inconsistent with the National Contingency Plan. On a periodic basis the EPA will send the Participating Parties a bill requiring payment that includes a Itemized Cost Summary (ICS) of all costs subject to payment under this Paragraph. The Participating Parties shall make all payments within 30 days of the Participating Parties' receipt of each bill requiring payment, except as otherwise provided in Paragraph 60. The Participating Parties shall make all payments required by this Paragraph by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party making the payment, EPA Site ID Number 05X4, and DOJ Case Number 90-11-2-06440. The Participating Parties shall send the check(s) to: U.S. EPA, Region 5, P.O. Box 56977, Chicago, IL, 60690.

b. At the time of payment, the Participating Parties shall send notice that payment has been made to the United States, to EPA and to the Regional Financial Management Officer, in accordance with Section XXVI (Notices and Submissions).

-58-

c.      The total amount to be paid by the Participating Parties pursuant to Paragraph 59.a. shall be deposited in the Sheboygan River and Harbor Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

60.      The Participating Parties may contest payment of any Upper River Future Response Costs under Paragraph 59 if they determine that the United States has made an accounting error or if they allege that a cost item that is included represents costs that are inconsistent with the NCP.  Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the United States pursuant to Section XXVI (Notices and Submissions).  Any such objection shall specifically identify the contested Upper River Future Response Costs and the basis for objection.  In the event of an objection, the Participating Parties shall within the 30 day period pay all uncontested Upper River Future Response Costs to the United States in the manner described in Paragraph 59.  Simultaneously, the Participating Parties shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of Illinois and remit to that escrow account funds equivalent to the amount of the contested Upper River Future Response Costs.  The Participating Parties shall send to the United States, as provided in Section XXVI (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Upper River Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account.

-59-

Simultaneously with establishment of the escrow account, the Participating Parties shall initiate the Dispute Resolution procedures in Section XIX (Dispute Resolution). If the United States prevails in the dispute, within 5 working days of the resolution of the dispute, the Participating Parties shall pay the sums due (with accrued interest) to the United States in the manner described in Paragraph 59. If the Participating Parties prevail concerning any aspect of the contested costs, the Participating Parties shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States in the manner described in Paragraph 59; the Participating Parties shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIX (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding the Participating Parties' obligation to reimburse the United States for its Upper River Future Response Costs.

61.     In the event that the payments required by Paragraph 59 are not made within 30 days of the Participating Parties' receipt of the bill, the Participating Parties shall pay Interest on the unpaid balance. The Interest on Upper River Future Response Costs shall begin to accrue on the date the bill is sent to the Participating Parties by EPA. The Interest shall accrue through the date of the Participating Parties' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of the Participating Parties' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Paragraph 76. The Participating Parties shall make all payments required by this Paragraph in the manner described in Paragraph 59.

-60-

## XVII. Indemnification and Insurance

62.     The Participating Parties' Indemnification of the United States.

a.     The United States does not assume any liability by entering into this agreement or by virtue of any designation of the Participating Parties as EPA's authorized representative under Section 104(e) of CERCLA.  The Participating Parties shall indemnify, save and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, or representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of the Participating Parties, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under their control, in carrying out activities pursuant to this Consent Decree, including, but not limited to, any claims arising from any designation of the Participating Parties as EPA's authorized representatives under Section 104(e) of CERCLA.  Further, the Participating Parties agree to pay the United States all costs it incurs including, but not limited to, attorneys fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of the Participating Parties, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Consent Decree.  The United States shall not be held out as a party to any contract entered into by or on behalf of the Participating Parties in carrying out activities pursuant to this Consent Decree. Neither the Participating Parties nor any such contractor shall be considered an agent of the United States.

b.     The United States shall give the Participating Parties notice of any claim

for which the United States plans to seek indemnification pursuant to Paragraph 62, and shall consult with the Participating Parties prior to settling such claim.

63. The Participating Parties waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States arising from or on account of any contract, agreement, or arrangement between the Participating Parties and any person for performance of Upper River Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, the Participating Parties shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between the Participating Parties and any person for performance of Upper River Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

64. No later than 15 days before commencing any on-site Upper River Work, the Participating Parties shall secure, and shall maintain until the first anniversary of EPA's approval of the Completion of Remedial Action Report for the final phase of Upper River Remedial Action as required under Task 5. D. 2 of the URSOW, comprehensive general liability insurance with limits (total of primary plus excess) of 3 million dollars, combined single limit, and automobile liability insurance with limits of 2 million dollars, combined single limit, naming the United States as additional insured. In addition, for the duration of this Consent Decree, the Participating Parties shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Upper River Work on behalf of the Participating Parties in

furtherance of this Consent Decree.  Prior to commencement of the Upper River Work under this

Consent Decree, the Participating Parties shall provide to EPA certificates of such insurance and

a copy of each insurance policy.  The Participating Parties shall resubmit such certificates and

copies of policies each year on the anniversary of the Effective Date.  If the Participating Parties

demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains

insurance equivalent to that described above, or insurance covering the same risks but in a lesser

amount, then, with respect to that contractor or subcontractor, the Participating Parties need

provide only that portion of the insurance described above which is not maintained by the

contractor or subcontractor.  The Participating Parties may satisfy the requirements of this

Paragraph if they submit to EPA for approval one of the financial assurance mechanisms of

Section XIII (Assurance of Ability to Complete Work), meeting all requirements of Section XIII,

demonstrating an ability to pay the amounts required under this Paragraph above and beyond the

amount required by Section XIII.

## XVIII. *FORCE MAJEURE*

65.     "*Force majeure*," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of the Participating Parties, of any entity controlled by the

Participating Parties, or of the Participating Parties' contractors, that delays or prevents the

performance of any obligation under this Consent Decree despite the Participating Parties' best

efforts to fulfill the obligation.  The requirement that the Participating Parties exercise "best

efforts to fulfill the obligation" includes using best efforts to anticipate any potential *force

majeure* event and best efforts to address the effects of any potential *force majeure* event (1) as it

is occurring and (2) following the potential *force majeure* event, such that the delay is minimized

-63-

to the greatest extent possible. "*Force Majeure*" does not include financial inability to complete the Upper River Work or a failure to attain the Performance Standards.

66. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a *force majeure* event, the Participating Parties shall notify orally EPA's Project Coordinator or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within 2 business days of when the Participating Parties first knew that the event was likely to cause a delay. Within 5 business days thereafter, the Participating Parties shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the Participating Parties' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the opinion of the Participating Parties, such event may cause or contribute to an endangerment to public health, welfare or the environment. The Participating Parties shall include with any notice all available documentation supporting their claim that the delay was attributable to a *force majeure* and may provide further information if it becomes available. Failure to comply with the above requirements shall preclude the Participating Parties from asserting any claim of *force majeure* for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. The Participating Parties shall be deemed to know of any circumstance of which the Participating

-64-

Parties, any entity controlled by the Participating Parties, or the Participating Parties' contractors knew or should have known.

67.     If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Consent Decree that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation.  If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify the Participating Parties in writing of its decision.  If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify the Participating Parties in writing of the length of the extension for performance of the obligations affected by the *force majeure* event.

68.     If the Participating Parties elect to invoke the dispute resolution procedures set forth in Section XIX (Dispute Resolution), they shall do so no later than 15 days after receipt of EPA's notice.  In any such proceeding, the Participating Parties shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a *force majeure* event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that the Participating Parties complied with the requirements of Paragraphs 65 and 66, above.  If the Participating Parties carry this burden, the delay at issue shall be deemed not to be a violation by the Participating Parties of the affected obligation of this Consent Decree identified to EPA and the Court.

-65-

## XIX. DISPUTE RESOLUTION

69.      Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of the Participating Parties that have not been disputed in accordance with this Section.

70.      Any dispute which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the parties to the dispute.  The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.  The dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute.

71.      Statements of Position.

a.      In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 20 days after the conclusion of the informal negotiation period, the Participating Parties invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by the Participating Parties.  The Statement of Position shall specify the Participating Parties' position as to whether formal dispute resolution should proceed under Paragraph 72 or Paragraph 73.

b.      Within 20 days after receipt of the Participating Parties' Statement of

-66-

Position, EPA will serve on the Participating Parties its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under Paragraph 72 or 73. Within 10 days after receipt of EPA's Statement of Position, the Participating Parties may submit a Reply.

        c.      If there is disagreement between EPA and the Participating Parties as to whether dispute resolution should proceed under Paragraph 72 or 73, the parties to the dispute shall follow the procedures set forth in the paragraph determined by EPA to be applicable. However, if the Participating Parties ultimately appeal to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in Paragraphs 72 and 73.

        72.     Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation: (i) the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this Consent Decree; and (ii) the adequacy of the performance of response actions taken pursuant to this Consent Decree. Nothing in this Consent Decree shall be construed to allow any dispute by the Participating Parties regarding the validity of the ROD's provisions.

        a.      An administrative record of the dispute shall be maintained by EPA and

shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute. The record will be available for inspection and copying by the Participating Parties.

b.       The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in Paragraph 72.a. This decision shall be binding upon the Participating Parties, subject only to the right to seek judicial review pursuant to Paragraph 72.c. and d.

c.       Any administrative decision made by EPA pursuant to Paragraph 72.b. shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by the Participating Parties with the Court and served on all Parties within 14 days of receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to the Participating Parties' motion in accordance with any schedule established by the Court.

d.       In proceedings on any dispute governed by this Paragraph, the Participating Parties shall have the burden of demonstrating that the decision of the Director of the Superfund Division, EPA Region 5, is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to Paragraph 72.a.

73. Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a. Following receipt of the Participating Parties' Statement of Position submitted pursuant to Paragraph 71, the Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute. The Superfund Division Director's decision shall be binding on the Participating Parties unless, within 14 days of receipt of the decision, the Participating Parties files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The United States may file a response to the Participating Parties' motion in accordance with any schedule established by the Court.

b. Notwithstanding Paragraph O of Section I (Background) of this Consent Decree, judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

74. The invocation of formal dispute resolution procedures under this Section shall not extend, postpone or affect in any way any obligation of the Participating Parties under this Consent Decree, not directly in dispute, unless EPA or the Court agrees otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 83. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that the Participating Parties do not

-69-

prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XX (Stipulated Penalties).

## XX. STIPULATED PENALTIES

75.     The Participating Parties shall be liable for stipulated penalties in the amounts set forth in Paragraphs 76 and 77 to the United States for failure to comply with the requirements of this Consent Decree specified below, unless excused under Section XVIII (*Force Majeure*). "Compliance" by the Participating Parties shall include performance and completion of the activities under this Consent Decree or any work plan or other plan approved under this Consent Decree identified below in accordance with all applicable requirements of law, this Consent Decree, the URSOW, and any plans or other documents approved by EPA pursuant to this Consent Decree and within the specified time schedules established by and approved under this Consent Decree.

76.     Stipulated Penalty Amounts - Upper River Work.

a.     Consistent with Section VI (Retention of a Work Party/Work Takeover), the Settling Defendant and the Work Party shall be jointly and severally liable for the following stipulated penalties, which shall accrue per violation per day, for any noncompliance identified in Paragraph 76.b.:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 1,000 | 1st through 14th day |
| $ 1,500 | 15th through 30th day |
| $ 2,000 | 31st day and beyond |

-70-

b. <u>Compliance Milestones</u>.

i. Submission of acceptable RD Work Plan.

ii. Completion of Upper River RD field work.

iii. Submission of acceptable Upper River RA Work Plans.

iv. Initiation of a phase of the Upper River Remedial Action as specified in the Upper River Work Plans.

v. Completion of a phase of the Upper River Remedial Action as specified in the Upper River Work Plans.

vi. Failure to provide access under Paragraph 29 or to seek access under Paragraph 31.

vii. Failure to pay Costs in accordance with Paragraphs 59 or 60.

viii. Failure to meet obligations imposed on the Settling Defendant under Section VI (Retention of a Work Party/Work Takeover).

77. <u>Stipulated Penalty Amounts - Reports</u>. Consistent with Section VI (Retention of a Work Party/Work Takeover), the Settling Defendant and the Work Party shall be jointly and severally liable for the following stipulated penalties, which shall accrue per violation per day, for failure to submit timely or adequate reports or other written documents pursuant to Paragraphs 35, 39, and 40:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $ 500 | 1st through 14th day |
| $ 1,000 | 15th through 30th day |
| $ 1,500 | 31st day and beyond |

-71-

78.     In the event that EPA assumes performance of a portion or all of the Upper River Work pursuant to Paragraph 11.c. of Section VI (Retention of a Work Party/Work Takeover), Settling Defendant shall be liable for a stipulated penalty in the amount of $2 Million.

79.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:  (i) with respect to a deficient submission under Section XI (EPA Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies the Participating Parties of any deficiency; (ii) with respect to a decision by the Director of the Superfund Division, EPA Region 5, under Paragraph 72.b. or Paragraph 73.a. of Section XIX (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that the Participating Parties' reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (iii) with respect to judicial review by this Court of any dispute under Section XIX (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

80.     Following EPA's determination that the Participating Parties have failed to comply with a requirement of this Consent Decree, EPA may give the Work Party and/or the Settling Defendant a written notice of such failure (a "Notice of Noncompliance"), which shall describe the relevant noncompliance.  EPA may send the Participating Parties a written demand

-72-

for the payment of the penalties, if any, associated with such noncompliance. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified the Participating Parties of a violation. Nothing in this Paragraph modifies the requirements and obligations of the Participating Parties as set forth in Section VI (Retention of a Work Party/Work Takeover). Moreover, EPA's right to issue a Notice of Noncompliance pursuant to this Paragraph with respect to any failure by the Participating Parties to comply with a requirement of this Consent Decree shall be in addition, and without prejudice, to EPA's right under this Consent Decree to issue one or more Notices of Material Noncompliance regarding the same failure.

81. All penalties accruing under this Section shall be due and payable to the United States within 60 days of the Participating Parties' receipt from EPA of a demand for payment of the penalties, unless the Participating Parties invoke the Dispute Resolution procedures under Section XIX (Dispute Resolution). All payments to the United States under this Section shall be paid by certified or cashier's check made payable to "EPA Hazardous Substances Superfund," shall be mailed to U.S. EPA, Region 5, P.O. Box 56977, Chicago, IL, 60690, shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site ID #05X4, the DOJ Case Number 90-11-2-06440, and the name and address of the party making payment. Copies of checks paid pursuant to this Section, and any accompanying transmittal letters, shall be sent to the United States as provided in Section XXVI (Notices and Submissions).

82. The payment of penalties shall not alter in any way the Participating Parties' obligation to complete the performance of the Upper River Work required under this Consent Decree.

-73-

83.     Penalties shall continue to accrue as provided in Paragraph 79 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owing shall be paid to EPA within 60 days of the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, the Participating Parties shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days of receipt of the Court's decision or order, except as provided in Subparagraph c below;

        c.      If the District Court's decision is appealed by any Party, the Participating Parties shall pay all accrued penalties determined by the District Court to be owing to the United States into an interest-bearing escrow account within 60 days of receipt of the Court's decision or order.  Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to the Participating Parties to the extent that they prevail.

84.     If the Participating Parties fail to pay stipulated penalties when due, the United States may institute proceedings to collect the penalties, as well as Interest.  The Participating Parties shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 81.

85.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of the Participating Parties' violation of this Decree or of the statutes and regulations

-74-

upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of

CERCLA, 42 U.S.C. § 9622(l).  Provided, however, that the United States shall not seek civil

penalties pursuant to Section 122(l) of CERCLA for any violation for which a stipulated penalty

is provided herein, except in the case of a willful violation of the Consent Decree.

86.     Notwithstanding any other provision of this Section, the United States may, in its

unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to

this Consent Decree.

## XXI. Covenants Not to Sue by Plaintiff

87.      In consideration of the actions that will be performed and the payments that have

been and will be made by the Participating Parties under the terms of the Consent Decree, and

except as specifically provided in Paragraph 88 of this Section, the United States covenants not

to sue or to take administrative action against the Participating Parties under CERCLA Section

106 or 107, 42 U.S.C. §§ 9606, 9607; RCRA Section 7003, 42 U.S.C. § 6973; Clean Water Act

Section 311, 33 U.S.C. § 1321, or Toxic Substances Control Act Section 7, 15 U.S.C. § 2606, for

performance of the Upper River Work and for recovery of Past Response Costs and Upper River

Future Response Costs.  These covenants not to sue are conditioned upon the satisfactory

performance by the Participating Parties of their obligations under this Consent Decree.  These

covenants not to sue extend only to the Participating Parties and do not extend to any other

person.

88.     General reservations of rights.  The covenant not to sue set forth above does not

pertain to any matters other than those expressly specified in Paragraph 87.  The United States

reserves, and this Consent Decree is without prejudice to, all rights against the Participating

Parties with respect to all other matters, including but not limited to, the following:

a.      claims based on a failure by the Participating Parties to meet a

requirement of this Consent Decree;

b.      liability arising from the past, present, or future disposal, release, or threat

of release of Waste Materials outside of the Site;

c.      liability for future disposal of Waste Material at the Site, other than as

provided in the ROD (as further delineated by the URSOW), the Upper River Work, or otherwise

ordered by EPA;

d.      liability for damages for injury to, destruction of, or loss of natural

resources, and for the costs of any natural resource damage assessments;

e.      criminal liability;

f.      liability for violations of federal or state law which occur during or after

implementation of the Upper River Remedial Action;

g.      liability, prior to notification of Completion of the Upper River Work, for

additional response actions that EPA determines are necessary to achieve Performance Standards,

but that cannot be required under this Consent Decree pursuant to Paragraph 22 (Modification of

the URSOW or related Work Plans);

h.      liability for response actions on the Middle River and Lower River and

Harbor at the Site or other work elements to complete the response actions contemplated in the

ROD, excluding any response actions relating to the Upper River;

i.      liability for costs that the United States will incur related to areas of the

Case 1:03-cv-00401-WCG    Filed 01/09/06    Page 78 of 98    Document 21

Site other than the Upper River; and

    j.  liability for additional response actions that may be required pursuant to

CERCLA Section 121(c), 42 U.S.C. Section 9621(c);

  89.  Notwithstanding any other provision of this Consent Decree, the United States

retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXII. COVENANTS BY THE PARTICIPATING PARTIES

  90.  <u>Covenant Not to Sue</u>. Subject to the reservations in Paragraph 91, the

Participating Parties hereby covenant not to sue and agree not to assert any claims or causes of

action against the United States with respect to the Upper River Work, past response actions at

the Site, and Upper River Future Response Costs as defined in this Consent Decree, including,

but not limited to:

    a.  any direct or indirect claim for reimbursement from the Hazardous

Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507)

through CERCLA Sections 106(b)(2), 107, 111, 112, 113 or any other provision of law;

    b.  any claims against the United States, including any department, agency or

instrumentality of the United States under CERCLA Sections 107 or 113 related to the Site, or

    c.  any claims arising out of response actions at or in connection with the

Site, including any claim under the United States Constitution, the Tucker Act, 28 U.S.C. § 1491,

the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law.

  Except as provided in Paragraph 98 (Waiver of Claim-Splitting Defenses), these

covenants not to sue shall not apply in the event that the United States brings a cause of action or

issues an order pursuant to the reservations set forth in Paragraphs 85, 87, 88 .b.- d. or 88.g.- j.,

-77-

but only to the extent that the Participating Parties' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

91. The Participating Parties reserve, and this Consent Decree is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred; provided, however, that (i) any such claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671, nor shall any such claim include a claim based on EPA's selection of response actions, or the oversight or approval of the Participating Parties' plans or activities; and (ii) this reservation applies only to claims which are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

92. Nothing in this Consent Decree shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

93. The Participating Parties agree not to assert any claims and to waive all claims or causes of action that they may have for all matters relating to the Upper River portion of the Site, including for contribution, against any person where the person's liability to the Participating

-78-

Parties with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if:

a. The materials contributed by such person to the Site containing hazardous substances did not exceed the greater of: (i) 0.002% of the total volume of waste at the Upper River Portion of the Site; or (ii) 110 gallons of liquid materials or 200 pounds of solid materials.

b. This waiver shall not apply to any claim or cause of action against any person meeting the above criteria if EPA has determined that the materials contributed to the Site by such person contributed or could contribute significantly to the costs of response at the Site. This waiver also shall not apply with respect to any defense, claim, or cause of action that the Participating Parties may have against any person if such person asserts a claim or cause of action relating to the Site against the Participating Parties.

## XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION

94. Except as provided in Paragraph 93, nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Consent Decree may have under applicable law. Except as specifically provided in Paragraph 93, each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto.

-79-

95.     The Parties agree, and by entering this Consent Decree this Court finds, that the Participating Parties are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for Matters Addressed in this Consent Decree.

96.     The Participating Parties agree that with respect to any suit or claim for contribution brought by them for matters related to this Consent Decree they will notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

97.     The Participating Parties also agree that with respect to any suit or claim for contribution brought against them for matters related to this Consent Decree they will notify in writing the United States within 30 days of service of the complaint on them.  In addition, the Participating Parties shall notify the United States within 10 days of service or receipt of any Motion for Summary Judgment and within 10 days of receipt of any order from a court setting a case for trial.

98.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, the Participating Parties shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XXI (Covenants Not to Sue by Plaintiff).

-80-

99. The Parties agree and, by entering this Consent Decree, this Court finds, that for purposes of CERCLA Section 113(g)(2)(B), 42 U.S.C. § 9613 (g)(2)(B), physical on-site construction of the Upper River Remedial Action does not constitute physical on-site construction of the remedial actions for the Middle and Lower River and Harbor areas of the Site.

## XXIV. ACCESS TO INFORMATION

100. The Participating Parties shall provide to EPA and WDNR, upon request, copies of all documents and information within their possession or control or that of their contractors or agents relating to the implementation of this Consent Decree, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Upper River Work. The Participating Parties shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Upper River Work.

101. Business Confidential and Privileged Documents.

a. The Participating Parties may assert business confidentiality claims covering part or all of the documents or information submitted to Plaintiff under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when they are submitted to EPA, or if EPA has notified the Participating Parties that the documents or information are not

confidential under the standards of Section 104(e)(7) of CERCLA, the public may be given

access to such documents or information without further notice to the Participating Parties.

        b.     The Participating Parties may assert that certain documents, records and

other information are privileged under the attorney-client privilege or any other privilege

recognized by federal law.  If the Participating Parties assert such a privilege in lieu of providing

documents, they shall provide the Plaintiff with the following:  (i) the title of the document,

record, or information; (ii) the date of the document, record, or information; (iii) the name and

title of the author of the document, record, or information; (iv) the name and title of each

addressee and recipient; (v) a description of the contents of the document, record, or

information: and (vi) the privilege asserted by the Participating Parties.  However, no documents,

reports or other information created or generated pursuant to the requirements of the Consent

Decree shall be withheld on the grounds that they are privileged.

102.    No claim of confidentiality or privilege shall be made with respect to any data,

including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific,

chemical, or engineering data, or any other documents or information evidencing conditions at or

around the Site.

## XXV. RETENTION OF RECORDS

103.    Until 10 years after the Participating Parties' receipt of EPA's notification pursuant

to Paragraph 55.c. of Section XIV (Notification of Completion), the Participating Parties shall

preserve and retain all non-identical copies of records and documents (including records or

documents in electronic form) now in its possession or control or which come into its possession

or control that indicate or prove its liability under CERCLA with respect to the Site, provided,

however, any Settling Defendant who is potentially liable as owner or operator of the Site must retain, in addition, all documents and records that relate to the liability of any other person under CERCLA with respect to the Site. The Participating Parties must also retain, and instruct their contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any documents or records (including documents or records in electronic form) now in their possession or control or which come into their possession or control that relate in any manner to the performance of the Upper River Work, provided, however, that the Participating Parties (and their contractors and agents) must retain, in addition, all data generated during the performance of the Upper River Work and not contained in the aforementioned documents required to be retained.  Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

104.     At the conclusion of this document retention period, the Participating Parties shall notify the United States at least 90 days prior to the destruction of any such records or documents, and, upon request by the United States, the Participating Parties shall deliver any such records or documents to EPA.  The Participating Parties may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If the Participating Parties assert such a privilege, they shall provide the Plaintiff with the following:  (i) the title of the document, record, or information; (ii) the date of the document, record, or information; (iii) the name and title of the author of the document, record, or information; (iv) the name and title of each addressee and recipient; (v) a

-83-

description of the subject of the document, record, or information; and (vi) the privilege asserted by the Participating Parties.  However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

105.    Settling Defendant hereby certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability regarding the Site since the Special Notice was issued for Upper River RD/RA on March 30, 2001, and that it has fully complied with any and all EPA requests for information pursuant to Section 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and § 3007 of RCRA, 42 U.S.C. § 6927.

## XXVI. NOTICES AND SUBMISSIONS

106.    Whenever, under the terms of this Consent Decree, written notice is required to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.  Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of the Consent Decree with respect to the United States, EPA, and the Participating Parties, respectively.

-84-

<u>As to the United States:</u>

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-11-2-06440

Matthew Richmond
Assistant United States Attorney
Office of United States Attorney
Eastern District of Wisconsin
Federal Building, Room 530
517 E. Wisconsin Avenue
Milwaukee, WI 53202

<u>As to EPA</u>:

Richard C. Karl
Director, Superfund Division
United States Environmental Protection Agency
Region 5 (S-6J)
77 W. Jackson Blvd.
Chicago, IL 60604

Pablo Valentin
EPA Project Coordinator
United States Environmental Protection Agency
Region 5 (SR-6J)
77 W. Jackson Blvd.
Chicago, IL 60604

As to the Regional Financial Management Officer:

Darius Taylor
Financial Management Office
United States Environmental Protection Agency
Region 5 (MF-10J)
77 W. Jackson Blvd.
Chicago, IL 60604

As to the State of Wisconsin

       Tom Wentland
       WDNR Project Manager
       Wisconsin Department of Natural Resources
       Southeast Region, Plymouth Service Center
       155 Pilgrim Rd.
       P.O.Box 408
       Plymouth, WI 53073-0408

       William Smith
       Acting Deputy Secretary
       Wisconsin Department of Natural Resources
       101 S. Webster Street
       P.O. Box 7921
       Madison Wisconsin 53707

As to: PRS:

       Mark S. Mather
       Pollution Risk Services, LLC
       100 E-Business Way,
       Suite 210
       Cincinnati, OH 45241

       Michael C. Davis
       Carter, Ledyard & Milburn LLP
       1401 I Street, N.W.
       Suite 300
       Washington, DC 20005

As to Tecumseh:

       Kerry J. DeKeyser
       Director, Environmental Control
       Tecumseh Products Company
       1604 Michigan Avenue
       New Holstein, WI 53601

       Steven M. Jawetz
       Beveridge & Diamond, P.C.
       1350 I Street, N.W., Suite 700
       Washington, DC 20005

Curtis B. Toll
Greenberg Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103

## XXVII. EFFECTIVE DATE

107.    The effective date of this Consent Decree shall be the date upon which this

Consent Decree is entered by the Court, except as otherwise provided herein.

## XXVIII. RETENTION OF JURISDICTION

108.    This Court retains jurisdiction over both the subject matter of this Consent Decree

and the Participating Parties for the duration of the performance of the terms and provisions of

this Consent Decree for the purpose of enabling any of the Parties to apply to the Court at any

time for such further order, direction, and relief as may be necessary or appropriate for the

construction or modification of this Consent Decree, or to effectuate or enforce compliance with

its terms, or to resolve disputes in accordance with Section XIX (Dispute Resolution) hereof.

## XXIX. APPENDICES

109.    The following appendices are attached to and incorporated into this Consent

Decree:

"Appendix A" is the ROD.

"Appendix B" is the URSOW.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the Original Consent Decree.

-87-

## XXX. Community Relations

110. The Participating Parties shall propose to EPA their participation in the community relations plan to be developed by EPA. EPA will determine the appropriate role for the Participating Parties under the Plan. The Participating Parties shall also cooperate with EPA in providing information regarding the Upper River Work to the public. As requested by EPA, the Participating Parties shall participate in the preparation of such information for dissemination to the public and in public meetings which may be held or sponsored by EPA to explain activities at or relating to the Site.

## XXXI. Modification

111. Schedules specified in this Consent Decree may be modified by agreement of EPA and the Participating Parties. All such modifications shall be made in writing.

112. Except as provided in Paragraph 22 (Modification of the URSOW or Related Work Plans), no material modifications shall be made to the URSOW without written notification to and written approval of the United States, the Participating Parties, and the Court, if such modifications fundamentally alter the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(B)(ii). Prior to providing its approval to any modification, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification. Modifications to the URSOW that do not materially alter that document, or material modifications to the URSOW that do not fundamentally alter the basic features of the selected remedy within the meaning of 40 C.F.R.300.435(c)(2)(B)(ii), may be made by written agreement between EPA, after providing the State with a reasonable opportunity to review and comment on the proposed modification, and the Participating Parties.

-88-

113.    In the event that the Work Party is replaced pursuant to Section VI (Retention of a Work Party/Work Takeover), the permanent replacement must execute a signature page to this Consent Decree, which shall constitute a material modification pursuant to this Section. Following execution of the signature page by the permanent replacement, the United States and the Settling Defendant shall petition the Court to approve the modification.

114.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

## XXXII. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

115.    This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate. The Participating Parties consent to the entry of this Consent Decree without further notice.

116.    If for any reason the Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXXIII. SIGNATORIES/SERVICE

117.    Each of the undersigned representatives of the Participating Parties to this Consent Decree and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the

terms and conditions of this Consent Decree and to execute and legally bind such Party to this document.

118.    The Participating Parties hereby agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States has notified the Participating Parties in writing that it no longer supports entry of the Consent Decree.

119.    Each of the Participating Parties shall identify, on the attached signature page, the name, address and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this Consent Decree.  Each of the Participating Parties hereby agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XXXIV.  FINAL JUDGMENT

120.    This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree.  The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.

121.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States and the

Participating Parties.  The Court finds that there is no just reason for delay and therefore enters

this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED this ___9th____ day of _____January_____, 2006..


 s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Tecumseh Products Company*, No. 03-C-401 (E.D. Wisc.), relating to the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin.

**FOR THE UNITED STATES OF AMERICA**

10/26/05                                    /s/ Kelly A. Johnson
Date                                            KELLY A. JOHNSON
                                                   Acting Assistant Attorney General
                                                   Environment and Natural Resources Division
                                                   U.S. Department of Justice
                                                   Washington, D.C.  20530

11/02/05                                     /s/ Gregory L. Sukys
Date                                            GREGORY L. SUKYS
                                                   Senior Attorney
                                                   Environmental Enforcement Section
                                                   Environment and Natural Resources Division
                                                   U.S. Department of Justice
                                                   P.O. Box 7611
                                                   Washington, D.C.  20044-7611
                                                   (202) 514-2068/616-6584 (FAX)

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Tecumseh Products Company*, No. 03-C-401 (E.D. Wisc.), relating to the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin.

STEVEN M. BISKUPIC
United States Attorney
Eastern District of Wisconsin


   11/04/05                        /s/ Matthew V. Richmond
Date

MATTHEW RICHMOND
Assistant United States Attorney
Office of United States Attorney
Eastern District of Wisconsin
Federal Building, Room 530
517 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-1700

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Tecumseh Products Company*, No. 03-C-401 (E.D. Wisc.), relating to the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin.


　09/29/05　　　　　　　　　　　　　　　　　/s/ Richard C. Karl　　　　　　
Date　　　　　　　　　　　　　　　　　　　RICHARD C. KARL
　　　　　　　　　　　　　　　　　　　　　Director, Superfund Division
　　　　　　　　　　　　　　　　　　　　　U.S. Environmental Protection Agency
　　　　　　　　　　　　　　　　　　　　　Region 5
　　　　　　　　　　　　　　　　　　　　　77 W. Jackson Blvd.
　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60604



　10/10/05　　　　　　　　　　　　　　　　　/s/ Richard L. Nagle　　　　　　
Date　　　　　　　　　　　　　　　　　　　RICHARD L. NAGLE
　　　　　　　　　　　　　　　　　　　　　Assistant Regional Counsel
　　　　　　　　　　　　　　　　　　　　　U.S. Environmental Protection Agency
　　　　　　　　　　　　　　　　　　　　　Region 5
　　　　　　　　　　　　　　　　　　　　　77 W. Jackson Blvd.
　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60604

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Tecumseh Products Company*, No. 03-C-401 (E.D. Wisc.), relating to the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin.

### FOR TECUMSEH PRODUCTS COMPANY

 Todd W. Herrick
Name of Officer

  /s/ Todd W. Herrick
Signature of Officer

 Chairman, President and Chief Executive Officer
Title

Address:

Tecumseh Products Company
100 E. Patterson Street
Tecumseh, MI   49286
(517) 423-8527

If different from above, the following is the name and address of Settling Defendant's agent for service and the name and address of Settling Defendant's counsel.  Counsel may act as agent for service.

Agent for Service                              Attorney

_____          Steven M. Jawetz
Name                                             Beveridge & Diamond, P.C.
                                                      1350 I Street, N.W., Suite 700
                                                      Washington, DC 20005
_____          (202) 789-6045
Address

Each Settling Defendant shall notify the United States Department of Justice of any change in the identity or address of Settling Defendant, its agent for service, or its counsel.

-95-

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Tecumseh Products Company*, No. 03-C-401 (E.D. Wisc.), relating to the Sheboygan River and Harbor Superfund Site in Sheboygan, Wisconsin.

**FOR POLLUTION RISK SERVICES, LLC**

Date:    09/13/05          　　  /s/ Mark S. Mather
　　　　　　　　　　　　　　MARK S. MATHER
　　　　　　　　　　　　　　Managing Member
　　　　　　　　　　　　　　Pollution Risk Services, LLC
　　　　　　　　　　　　　　100 E-Business Way
　　　　　　　　　　　　　　Suite 2109
　　　　　　　　　　　　　　Cincinnati, OH 45241
　　　　　　　　　　　　　　(513) 489-2793

If different from above, the following is the name and address of PRS' agent for service and the name and address of PRS' counsel.  Counsel may act as agent for service.

Agent for service and Counsel:

Michael C. Davis
Carter, Ledyard & Milburn LLP
1401 Eye Street, N.W.
Suite 300
Washington, DC 20005
(202) 623-5710

PRS shall notify the United States Department of Justice of any change in the identity or address of PRS, its agent for service, or its counsel.