IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | No. 1:03-cv-00401-WCG |
| v. | Hon. William C. Griesbach |
| TECUMSEH PRODUCTS COMPANY POLLUTION RISK SERVICES, LLC, AND PALACE ASSOCIATES LLC, | |
| Defendants. | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION
FOR ENTRY OF CONSENT DECREE**

The United States, on behalf of the United States Environmental Protection Agency, respectfully files this memorandum in support of its unopposed motion for entry of the consent decree pertaining to the Lower River portion of the Sheboygan River and Harbor Superfund Site, in Sheboygan County, Wisconsin. The proposed consent decree was lodged in this action on June 13, 2011. In support of its Motion, Plaintiff states:

1. On or about May 7, 2003, the United States, on behalf of the United States Environmental Protection Agency ("U.S. EPA"), filed a complaint in this matter against Defendant Tecumseh Products Co. ("Tecumseh" or "Settling Defendant"), pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§9606, 9607.

2. The United States in its complaint seeks, among other things: (1) reimbursement by Tecumseh of the costs incurred by U.S. EPA and the Department of Justice in responding to

the release and threatened release of CERCLA hazardous substances into the Upper River portion of the Sheboygan River and Harbor Superfund Site ("Site"), together with accrued interest; and (2) the performance of response work at the Site by Tecumseh consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 (as amended).

3. On May 12, 2004, this Court approved and entered a Consent Decree in this matter ("2004 Consent Decree" or "Original Consent Decree") that requires Tecumseh to: (1) implement those components of the remedy set forth in a May 12, 2004 U.S. EPA Record of Decision that addresses the Upper River section of the Site; (2) pay at least $2.1 million towards U.S. EPA's past Site past response costs; and (3) pay all future Upper River response costs incurred by the United States. The remedial measures required to be implemented under the 2004 Consent Decree include characterizing and removing river sediments contaminated with polychlorinated biphenyls ("PCBs") in the Upper River portion of the Site, conducting additional groundwater monitoring and investigation, and removing some floodplain soils. These response actions, estimated to cost $28 million, constituted the initial part of the remedy for the Site.

4. On or about January 9, 2006, this Court approved and entered an Amendment to the 2004 Upper River Consent Decree which was requested by Tecumseh. Under the terms of that Amendment, Pollution Risk Services, LLC ("PRS"), designated a "Work Party:" (a) voluntarily subjected itself to the jurisdiction of this Court; (b) became party to the Amended Consent Decree; (c) agreed to be bound by the terms of the Amended Consent Decree; (d) acknowledged that the rights and privileges accorded under the Agreement and the Amended Consent Decree provide adequate consideration for PRS's agreement to perform the Upper River Work; and (e) agreed to be jointly and severally liable for the completion of the remedy.

5. In 2006, PRS purchased the former Tecumseh plant in Sheboygan Falls Wisconsin, which was a source of hazardous substances released to the Site. Subsequently, Palace Associates II, LLC, ("Palace") an affiliate of PRS, purchased the remainder of the Tecumseh plant site.

6. On or about June 14, 2011, this Court authorized the United States to amend the complaint. The Amended Complaint alleges that PRS and Palace, as current owners of facilities at the Site, are liable, under CERCLA Sections 106 and 107(a)(1), respectively, for the performance of response actions at the Site and for the response costs incurred by the United States at the Site. See 42 U.S.C. §§9606 and 9701(a)(1). Because Tecumseh, no longer a current owner of a facility at the Site, remains liable under CERCLA Sections 106 and 107(a)(2), as an "owner or operator" of a facility at the Site at the time of disposal of hazardous substances (See 42 U.S.C. §9607(a)(2)), the Amended Complaint clarifies Tecumseh's status.

7. Under the proposed Consent Decree, Tecumseh, PRS, and Palace would be required to finance and perform the remedy for the remainder of the Site, *i.e.,* the Lower River, Middle River, and Inner Harbor portions of the Site, at an approximate cost of $12.6 million, and to pay U.S. EPA's cost of overseeing the remedial action. As in the case of the 2006 Amendment, however, the party that will actually undertake the work is PRS, which is designated in the proposed Consent Decree as the "Lower River Work Party." Also, as in the case of the 2006 Amendment, Tecumseh will remain fully liable in the event that PRS defaults on its obligations under the Decree. As the remedial action for the Site should be completed under the proposed Consent Decree, the United States anticipates that this will be the last Consent Decree pertaining to this Site.

3

8. In accordance with CERCLA Section 122(d)(2)(B), 42 U.S.C. §9622(d)(2)(B), and 28 C.F.R. Part 50.7, the United States Department of Justice, on June 24, 2011, published a notice in the Federal Register, inviting the public to comment on the proposed Consent Decree for a 30-day period commencing with the date of publication of the notice. See 76 Fed. Reg. 37,152 (June 24, 2011). The 30-day comment period has expired, with the United States receiving no comments on the proposed Consent Decree.

9. The United States, noting that no comments have been received by the Attorney General concerning the proposed settlement, now requests that the Court sign and enter the proposed Consent Decree. A proposed Order has also been provided.

## STANDARD OF REVIEW

10. Voluntary settlement of legal disputes is favored by the courts and is generally perceived to be in the public interest. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983). The public policy favoring the resolution of litigation through settlements is particularly strong in environmental cases. *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1029 (D. Mass. 1989) (the "Congressional purpose [of protecting and preserving public health and the environment] is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation").

11. The well-settled standard of review applied to a proposed government settlement under CERCLA is whether the settlement is fair (from both procedural and substantive standpoints), reasonable, and consistent with the statute's purposes. *United States v. Davis*, 261 F.3d 1, 23-28 (11th Cir. 2001); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d at 1424, 1426 (6th Cir. 1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990);

4

*United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992) (internal citations omitted); *United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997); *United States v. Mid-State Disposal, Inc.*, 131 F.R.D. 573, 577 (W.D. Wis. 1990). This standard of review is consistent with the standard of review that pertains to consent decrees generally. *See In re Flight Trans. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984) (settlements should be "fair, reasonable and adequate"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999).

12. Review of such settlements is committed to the discretion of the reviewing court, *see United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985), which is to exercise that discretion in a limited and deferential manner, *Davis*, 261 F.3d at 21; *Cannons Eng'g*, 899 F.2d at 84; *Akzo Coatings*, 949 F.2d at 1424; *Donovan v. Robbins*, 752 F.2d 1170, 1176-77 (7th Cir. 1985). In a recent decision, the Seventh Circuit aptly described the standard as follows:

> In reviewing the consent decrees, we are constrained by a double dose of deference. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). First, the trial court must defer to the expertise of the agency and to the federal policy encouraging settlement. *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003). Thus, the district court must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair. *Id.* We, in turn, defer to the district court's decision—reviewing only for an abuse of discretion. *Cannons Eng'g*, 899 F.2d at 84.

*United States v. George A. Whiting Paper Co.*, 2011 WL 1662833, at *2 (7th Cir. May 4, 2011).

13. The judicial deference to settlements reached by the parties to CERCLA litigation is "particularly strong" when that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." Akzo Coatings, 949 F.2d at 1436 (internal citation omitted). *Accord Davis*, 261 F.3d at 21; *In re Energy Coop. Inc.*, 173 B.R. 363, 367 (N.D. Ill. 1994). Indeed, such

5

settlements deserve "a strong presumption of . . . validity." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995). *Accord United States v. Kramer*, 19 F. Supp. 2d 273, 285 (D.N.J. 1998); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 681 (D.N.J. 1989). The balance of competing interests affected by a settlement with the federal government "must be left, in the first instance, to the discretion of the Attorney General," *Kelley v. Thomas Solvent*, 717 F. Supp. 507, 515 (W.D. Mich. 1989) (internal quotation omitted), since the Attorney General retains "considerable discretion in controlling government litigation and in determining what is in the public interest." *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976).

14. The settlement set forth in the proposed Consent Decree is consistent with the criteria set forth above.

## SITE CHARACTERISTICS, GOVERNMENT RESPONSE ACTIONS, AND PROVISIONS OF THE ORIGINAL CONSENT DECREE

### Site Characteristics

15. The Sheboygan River runs from west to east in east central Wisconsin, through the municipalities of Sheboygan Falls, Kohler, and Sheboygan, before emptying into Lake Michigan about 55 miles north of Milwaukee. The Sheboygan River and Harbor Site is comprised of the Sheboygan River starting at Sheboygan Falls and heading east to, and including, the Sheboygan Harbor, comprising a total of approximately 14 river miles. The river is generally characterized by fast, rocky stretches in the upper reaches and slower, more sediment-laden stretches in the lower portions. The Upper River section of the Site runs from the Sheboygan Falls Dam in the City of Sheboygan Falls to the Waelderhaus Dam in Kohler, including floodplain soils adjacent to the river and soil and groundwater on the Tecumseh Products Company plant located adjacent to the river in Sheboygan Falls, Wisconsin. The

6

Lower River portion of the Site includes the lower 14 miles of the Sheboygan River from the Sheboygan Falls Dam downstream to, and including, the Inner Harbor.

16. In addition to PCB-contaminated sediment in the river and harbor, some floodplain soils are contaminated with PCBs, and groundwater and additional PCB sources associated with the former Tecumseh plant in Sheboygan Falls are also part of the Site. Site risks include risks to humans via consumption of PCB-contaminated fish.

17. During a study in 1977, the Wisconsin Department of Natural Resources ("WNDR") found elevated levels of PCBs in river fish. Sheboygan Harbor sediment was initially tested for PCB concentrations as part of that study and analyses showed that harbor sediment contained PCBs. In 1978, a consumption advisory was put into effect and continues to date. During a subsequent study in 1985-86, the WDNR found elevated PCB levels in certain waterfowl species collected from the Sheboygan River and Harbor; and in 1987 the WDNR issued consumption advisories for two species of waterfowl taken from the Sheboygan River and Harbor.

18. Land use along the Upper River is industrial, residential and recreational in Sheboygan Falls. Land use in the Middle River consists of a horse farm, a tree nursery, and a golf course. A private hunting and fishing club is on the south side of the river adjacent to the Upper and Middle River. Land use adjacent to the Lower River and Inner Harbor is recreational, commercial and industrial with some residential areas. The City of Sheboygan's central business district is on the north bank of the river in the harbor area. There are no public beaches along the river or harbor. The Lower River and Harbor are navigable, but the Upper River and Middle River traffic is typically restricted to smaller craft such as canoes and kayaks.

19. The Sheboygan River is not used as a public water supply, but it drains into Lake Michigan, which is used as a drinking water source by Sheboygan, Sheboygan Falls, and Kohler. The three cities regularly test the public water and thus far, it is safe to drink. Contaminated groundwater near Tecumseh's former Sheboygan Falls Plant is not used as drinking water.

20. U.S. EPA placed the Site on the CERCLA National Priorities List ("NPL") on or about May 21, 1986. See 51 Fed. Reg. 21,054 (June 10, 1986). The NPL, established pursuant to Section 105(a) of CERCLA, 42 U.S.C. §9605(a), and 40 C.F.R. Part 300, lists sites throughout the United States that, because of releases or threatened releases of hazardous substances, pose a significant threat to human health and the environment.

**The Complaint**

21. Tecumseh's former facility, which is located adjacent to the Sheboygan River in Sheboygan Falls, once manufactured refrigeration and air conditioning compressors and gasoline engines. U.S. EPA identified Tecumseh as a potentially responsible party ("PRP") with respect to the PCB contamination because PCBs were found in sewer lines leading from Tecumseh's facility to the river and in hydraulic fluids used in Tecumseh's manufacturing processes. The PCB contamination level is high in the sediments immediately in the vicinity of the Tecumseh facility.

22. Thus, the original Complaint alleged that Tecumseh was liable under CERCLA Section 107(a)(1), 42 U.S.C. §9607(a)(1), as the then current owner and operator of a facility from which hazardous substances were released into the Sheboygan River. However, in 2006, PRS purchased a portion of the Tecumseh plant site that was a source of hazardous substances that had been released to the River. Subsequently, Palace, an affiliate of PRS, purchased the remainder of Tecumseh's plant site.

23. As a result, the Amended Complaint alleges that PRS and Palace are each liable under CERCLA Section 107(a)(1), 42 U.S.C. §9607(a)(1), because each of them is the owner of a portion of a facility from which hazardous substances were released into the Sheboygan River. The Amended Complaint alleges that Tecumseh is liable under CERCLA Section 107(a)(2), 42 U.S.C. §9607(a)(2), as the "owner or operator" of the facility at the time of disposal of hazardous substances.

**Response Actions**

24. Tecumseh conducted a Remedial Investigation ("RI") for this Site from May 1987 to June 1988. The RI Report, completed in May 1990, indicated that PCB concentrations were substantially higher in the Upper River than those in downstream sections. Three sediment locations in the Upper River contained between 890 and 4,500 parts per million ("ppm") PCBs. Tecumseh proposed an Alternative Specific Remedial Investigation ("ASRI") to remove sediments in certain targeted areas, to armor certain sediment areas, and to test bioremediation of sediments in a tank constructed on site; Tecumseh submitted a report supporting these activities in 1992. The ASRI investigations, including fish tissue sampling, sediment location sampling and bioremediation studies, were completed during the work seasons of 1993 to 1995. Over a year of discussions among U.S. EPA, WDNR, and Tecumseh concerning the scope of the Feasibility Study ("FS") followed. Tecumseh submitted a draft feasibility study ("FS") to U.S. EPA in September 1997 and a revised FS in April 1998, in response to extensive and significant comments by U.S. EPA and WDNR.

25. U.S. EPA selected a preferred alternative and published a proposed plan for the Site in August 1999. After extensive public comments and a National Remedy Review Board review, U.S. EPA issued a Record of Decision ("ROD") for the Site on

9

26. May 12, 2000.[1] The major components of the remedy, as refined in the Statement or Work ("SOW"), are as follows.[2]

• **Lower River**: sediment characterization, removal of sediment if necessary to achieve a soft sediment surface weighted average concentration ("SWAC") of 0.5 ppm in the Lower River, annual surveys to identify areas susceptible to scour, and fish and sediment sampling to document natural processes and ensure that over time the entire river will reach an average PCB sediment concentration of 0.5 ppm or less.

• **Inner Harbor**: sediment characterization, removal of approximately 53,000 cubic yards of PCB-contaminated sediment to achieve a SWAC of 0.5 ppm in the Inner Harbor, annual surveys to identify areas susceptible to scour, fish and sediment sampling to document natural processes and ensure that over time the entire river will reach an average PCB sediment concentration of 0.5 ppm or less, and maintenance of the Outer Harbor breakwalls.[3]

• **Middle River**: post-remediation monitoring and evaluation of natural processes in achieving a 0.5 ppm SWAC over time. Removal of sediment within a sediment deposit will be deemed complete when 3-4 inches, on average, of residual sediment remains in a deposit as

---

[1] WDNR participated in settlement negotiations with Tecumseh that preceded the 2004 Consent Decree. However, the State had declined to concur in the ROD, and declined to sign the 2004 Consent Decree, the 2006 Amendment, and the proposed Consent Decree.

[2] Although the ROD selected one remedy for the Upper River portion, another for the Lower River and Inner Harbor areas, and a separate remedy for the Middle River, for simplicity the Consent Decree for the Lower River defines "Lower River" to mean "the Middle River, Lower River, and Inner Harbor as identified in the ROD."

[3] The Inner Harbor includes the Sheboygan River from the Pennsylvania Ave. Bridge to the river's outlet to the Outer Harbor. The Outer Harbor is defined as the area formed by the two break walls. The break walls protect Inner Harbor sediment from Lake Michigan wave action and keep the highest levels of contaminated sediment at depth.

determined by probing after dredging or after three passes with conventional dredging equipment, which ever goal is achieved first.

- Removal of floodplain soils containing PCB concentrations above 10 ppm.
- Investigation and mitigation of potential groundwater contamination and possible continuing sources of contamination at the former Tecumseh Plant in Sheboygan Falls.
- Placement of institutional controls to limit access to Tecumseh's Sheboygan Falls Plant groundwater as a drinking water source.

27. The remedy for the Upper River portion of the Site, as well as mitigation of potential groundwater contamination and source control at Tecumseh's former plant in Sheboygan Falls, was completed under the 2004 Consent Decree and the 2006 Amendment; the final inspection of the Upper River remedial action was conducted in November 2007. Floodplain soil removal work which was required under the 2004 Consent Decree and the 2006 Amendment is not yet completed; U.S. EPA is negotiating with the adjacent property owner for access to the floodplains.

28. As a preliminary action to negotiating the decree for the Lower River portion of the Site, U.S. EPA in early 2009 issued special notice letters to Tecumseh/PRS, Kohler Products and Thomas Industries (the only known PRPs for the Lower River), inviting them to negotiate. Only PRS made a good faith offer. To expedite work, PRS performed the remedial design under an administrative order, and was tasked with characterizing the contamination in the Lower River.

29. As part of the recharacterization of the Lower River and Inner Harbor, U.S. EPA obtained information on the nature and extent of the contamination that required a change in the remedy. On December 29, 2010, U.S. EPA issued an Explanation of Significant Differences

11

("ESD") that modified the selected remedy by adjusting the estimated volume of contaminated sediment to be removed from the river, the areas from which those sediments will be removed and the cost of the modified remedy (from $12.1 million to $12.6 million). However, the ESD did not fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost.

30. Specifically, the ROD called for no dredging in the Lower River, but the ESD requires the removal of 16,158 cubic yards of sediment. Further, the ROD called for 53,000 cubic yards of sediment to be dredged from the Inner Harbor, but the ESD adjusted that figure to 34,390 cubic yards, resulting in an overall decrease in dredging volume of 2,452 cubic yards. The Middle River characterization efforts conducted during the pre-design investigation confirmed, as anticipated in the ROD, that no sediment deposits in the Middle River need to be removed. The long term monitoring element of the Middle River portion of the Site will be implemented under the proposed Consent Decree.

## PREVIOUS CONSENT DECREES

**2004 Consent Decree (Remediation of the Upper River portion of the Site**

31. The first Consent Decree for this Site, entered May 12, 2004, requires Tecumseh to: (a) pay $2.1 million towards the government's past response costs at the Site; (b) pay all Future Costs associated with the Upper River work; and (c) implement those components of U.S. EPA's selected remedy for the Upper River portion of the Site, at an estimated cost of $28 million (discussed above).

12

**2006 Amendment of 2004 Consent Decree**

32. During the negotiations that resulted in the original Consent Decree, Tecumseh proposed to: (a) add PRS, its project coordinator, as a party and signatory to the Consent Decree, such that PRS would assume all of Tecumseh's obligations under the Consent Decree and be the party to whom U.S. EPA would first look for purposes of enforcing those obligations; (b) remain a party to the Consent Decree and ultimately be responsible for ensuring that its obligations under the Consent Decree are satisfied; and (c) fund PRS's participation in the settlement via an insurance policy that would also serve as financial assurance. The United States agreed to consider Tecumseh's proposal. However, to preclude losing several construction seasons, the United States insisted that lodging of the Original Consent Decree not be delayed pending the development of acceptable language. The Original Consent Decree was lodged in early 2004 and entered on May 12, 2004. Discussions regarding the proposed Amended Consent Decree began shortly thereafter.

33. On January, 9, 2006, the Court approved and entered an Amendment to the 2004 Upper River Consent Decree, in which PRS: (a) voluntarily subjected itself to the jurisdiction of this Court; (b) became party to the Amended Consent Decree; (c) agreed to be bound by the terms of the Amended Consent Decree; (d) acknowledged that the rights and privileges accorded under the Agreement and the Amended Consent Decree provide adequate consideration for PRS's agreement to perform the Upper River Work; and (e) agreed to be jointly and severally liable for the completion of the remedy. As noted above, Tecumseh remained jointly and severally liable to complete the Upper River remedy if, for any reason, PRS failed to do so.

## PROPOSED CONSENT DECREE

**Reimbursement of Response Costs**

34.     Section V of the proposed Consent Decree requires the Settling Defendants, *i.e.,* Tecumseh, PRS and Palace, to reimburse the United States for the "Lower River Future Response Costs;" which the Consent Decree defines as all costs incurred on and after November 1, 2010.[4]  Consent Decree, §V, ¶6.  Section XVI of the proposed Consent Decree establishes the procedures under which the L.R. Work Party (*i.e.,* PRS) will pay the Lower River Future Response Costs.  Consent Decree §XVI, ¶¶58-61.

**Remediation of the Lower River portion of the Site**

35.     Section V of the Consent Decree also requires Tecumseh, PRS and Palace, to finance and implement those portions of U.S. EPA's selected remedial action that cover the Lower River portion of the Site.  Consent Decree, §V, ¶6.  However, PRS, as the "L.R. Work Party," will be responsible for implementation of the response actions at the Site. Consent Decree, §V, ¶5.

36.     Similar to the arrangement under the 2006 Amendment,[5] the proposed Consent Decree would require Tecumseh, PRS and Palace, to implement the remedy for the Lower River portion of the Site, but PRS will be solely responsible, in the first instance, for the Lower River Work.  Consent Decree, §V, ¶ 5; §VI, ¶¶10-11.

---

[4] In accordance with the 2004 Consent Decree, Tecumseh paid $2.1 million toward EPA's response costs. Tecumseh/PRS have paid all costs incurred between September 1, 2002 and October 31, 2010, i.e., the "Future Costs" defined under the 2004 Consent Decree.

[5] The 2004 Consent Decree required Tecumseh to implement those components of the remedy set forth in the ROD covering the Upper River portion of the Site.  Under the 2006 Amendment, Tecumseh remained liable for performance of the remedy, but PRS assumed specified obligations and liabilities for remediation of the Site and associated costs for which Tecumseh

37. Consistent with Section V, U.S. EPA acknowledges in Section VI that the "L.R. Work Party," (PRS) is the Settling Defendant that will be primarily responsible for the performance of the Lower River Work, as well as for corrective measures and stipulated penalties for noncompliance with the terms of the Consent Decree, unless and until U.S. EPA issues a notice of default (pursuant to Paragraph 11.b) or until PRS becomes bankrupt. In the event of a default or bankruptcy by PRS, U.S. EPA may immediately seek performance from Tecumseh (Consent Decree, §VI, ¶11.a.ii(B)), but, alternatively, the Settling Defendants may replace PRS. (Consent Decree, §VI, ¶11.a.ii(C)). U.S. EPA also may assume performance of all or any portion of the Lower River Work if U.S. EPA determines that PRS (or Tecumseh, if U.S. EPA seeks performance under Consent Decree, §VI, ¶11.a.ii(B)), has ceased implementation of the remedy, or fails to remedy a notice of default, or is implementing the Lower River Work in such a way as to cause an endangerment. Consent Decree, §VI, ¶11.b-c. Paragraph 13 describes the circumstances under which PRS may be replaced. Consent Decree, §VII, ¶13.

38. All three of the Settling Defendants are liable for the payment of stipulated penalties for failure to comply with an obligation assigned to them under the Consent Decree. Consent Decree, §XX, ¶¶75-85. However, U.S. EPA, as a matter of enforcement discretion, has agreed that it will seek stipulated penalties for noncompliance with the terms of this Consent Decree only from the L.R. Work Party. Consent Decree, §VI, ¶11.a.ii(B). Nonetheless, in the event that U.S. EPA assumes performance of a portion or all of the Lower River Work pursuant to the Work Takeover provisions of the Decree, the Settling Defendants will be jointly and severally liable for a stipulated penalty in the amount of $2 million. Consent Decree, §XX, ¶78.

---

was responsible under the 2004 Upper River Consent Decree, including Tecumseh's obligation

15

39. Prior to execution of the 2006 Amendment, Tecumseh obtained a Manuscript Remediation Cost Cap insurance policy from the Chubb Group of Insurance Companies for use in funding: (1) the remedial action and the O & M to be performed by PRS under the 2006 Amendment; and (2) the work covered by any subsequent Consent Decrees. Along with Tecumseh and PRS, U.S. EPA is a named beneficiary of that policy. Chubb and Tecumseh have negotiated an addendum to the policy that makes clear that the policy is intended to fund the Lower River Work as well.

## CONCLUSION

40. The settlement embodied in the proposed Consent Decree constitutes the United States' best efforts to resolve this case fully and fairly in a manner consistent with the interests of the public. Under the proposed Consent Decree, Tecumseh, PRS, and Palace would be required to finance and perform the remedy for the Lower River, Middle River, and Inner Harbor portions of the Site, at a cost of about $12.6 million, and pay U.S. EPA's cost of overseeing the remedial action. As in the case of the 2006 Amendment, the party that will actually undertake the work is PRS, which would be designated as the "Lower River Work Party." Also, as in the case of the 2006 Amendment, Tecumseh will remain fully liable in the event that PRS defaults on its obligations under the Consent Decree.

41. The United States believes that the proposed Consent Decree is fair, reasonable, consistent with the purposes of CERCLA, and in the public interest. Moreover, the Department of Justice did not receive any comments that "disclose [any] facts or considerations which indicate that the proposed judgment is inappropriate, improper, or inadequate" or that the remedy

---

to perform the Upper River Work.

16

selected by U.S. EPA is arbitrary, capricious or otherwise not in accordance with law. 42 U.S.C. §9622(d)(2)(B).

    42. Through emails dated August 3, 2001, Samantha Corson, an attorney representing Tecumseh, and Mark Mather, Manager of the Assured Group of Companies (which includes PRS and Palace), advised Gregory L. Sukys, an attorney with the U.S. Department of Justice, that the parties they represent interpose no objection to entry of the proposed Consent Decree.

    THEREFORE, the Attorney General reaffirms his consent to the proposed judgment and the United States respectfully requests that the Court enter the proposed Consent Decree.

    Respectfully submitted,

    IGNACIA S. MORENO
    Assistant Attorney General
    Environment and Natural Resources Division

    /s/ Gregory L. Sukys
    GREGORY L. SUKYS
    Virginia Bar No. 24293
    Senior Attorney
    Environmental Enforcement Section
    U.S. Department of Justice
    P.O. Box 7611
    Washington, D.C. 20530
    Te;le: 202-514-2068
    Fax: 202-616-6584
    greg.sukys@usdoj.gov

    JAMES L. SANTELLE
    United States Attorney

    /s/ Susan Knepel
    SUSAN KNEPEL
    Assistant United States Attorney
    Wisconsin Bar No. 1016482
    Eastern District of Wisconsin
    Federal Building, Room 530
    517 East Wisconsin Avenue
    Milwaukee, WI 53202
    Tele. 414/ 297-1723

Fax. 414/297-4394
susan.knepel@usdoj.gov

OF COUNSEL:

RICHARD NAGLE
MARK PALERMO
Associate Regional Counsel
U.S. EPA - Region 5
77 West Jackson Blvd.
Chicago, IL 60604
312-353-8222